COPY

FILED
CLERK, U.S. DISTRICT COURT
JAN 24 2011
CENTRAL DISTRICT OF CALIFORNIA
BY ______ DEPUTY

David M. Birka-White (State Bar No. 85721)
dbw@birka-white.com
Mindy M. Wong (State Bar No. 267820)
mwong@birka-white.com
BIRKA-WHITE LAW OFFICES
411 Hartz Avenue, Suite 200
Danville, CA 94526
Telephone: (925) 362-9999
Facsimile: (925) 362-9970

(Additional Counsel Listed Below)

*Attorneys for Individuals and Representative Plaintiffs* PAUL ROTH and LYNN ROTH

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| PAUL ROTH and LYNN ROTH, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UPONOR, INC., an Illinois corporation, RADIANT TECHNOLOGY, INC., a Delaware corporation, and DOES 1-10, inclusive,<br><br>Defendants. | Case No. CV11-00705 GW(JCx)<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND RESTITUTION:**<br><br>1) **CONSUMERS LEGAL REMEDIES ACT (Civ. Code. §§ 1750, *et seq.*)**<br><br>2) **UNFAIR COMPETITION LAW (Bus. & Prof. Code §§ 17200, *et seq.*)**<br><br>3) **UNFAIR COMPETITION LAW (Bus. & Prof. Code §§ 17500, *et seq.*)**<br><br>4) **UNJUST ENRICHMENT**<br><br>5) **BREACH OF IMPLIED WARRANTY**<br><br>6) **BREACH OF EXPRESS WARRANTY**<br><br>7) **FRAUD**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiffs Paul Roth and Lynn Roth ("Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their undersigned counsel, upon personal knowledge, information, and belief allege as follows:

## INTRODUCTION

1. This is a class action for damages and/or restitution on behalf of Plaintiffs and all persons or entities who own properties where an Uponor or Radiant Technology, Inc. ("RTI") polyethylene ("PEX") plumbing system with defective high zinc content brass fittings ("Fittings") sold by Uponor and/or RTI is and/or was installed.

2. Plaintiffs and all similarly situated owners of such properties have been damaged by Defendants' failure to properly design, develop, test, manufacture, distribute, market, and sell their PEX plumbing systems that utilize high zinc content brass ("yellow brass") fittings in that the fittings are defective, leak, and must be removed and replaced.

3. Uponor and RTI warranted and advertised that their PEX plumbing systems with brass insert fittings had a 25 year warranty that expressly covered consequential damages arising from defective tubing and fittings.

4. After selling the brass insert fittings across the United States, Uponor and RTI now admit that the fittings are defective, and not merchantable. However, Defendants refuse to replace the plumbing systems of Plaintiffs and the proposed class in which the admittedly defective brass fittings are installed.

5. The yellow brass fittings ("Fittings") are defective and begin to fail on the first day of installation. These failures have and will in the future cause water leaks. These leaks have and will cause damage to the homes and property of Plaintiff and the proposed class.

## PARTIES

6. Plaintiffs and putative class representatives Paul Roth and Lynn Roth, husband and wife, are residents of Lancaster, California and the owners of real

property located at 1610 E. Avenue J-2, Lancaster, California (the "Property"). The Property has defective RTI brass insert fittings and the PEX plumbing system has failed and leaked, causing damage to the Property.

7. Uponor, Inc. ("Uponor"), an Illinois corporation, is the successor to Uponor North America, Inc., (formerly Wirsbo Company), and maintains its principal place of business at 5925 148th Street West, Apple Valley, Minnesota. Uponor is a subsidiary of an international conglomerate headquartered in Vantaa, Finland, with extensive operations in both Europe and North America. Uponor was responsible for, or otherwise involved in, the development, manufacture, sales, distribution, and/or warranting of the Wirsbo PEX plumbing system including the defective Wirsbo yellow brass fittings.

8. Radiant Technology, Inc. ("RTI"), a Delaware corporation, and wholly owned subsidiary of Uponor, is also located at 5925 148th Street West, Apple Valley, Minnesota, and is or was engaged in the business of manufacturing, supplying and distributing various products including, but not limited to, the defective RTI yellow brass fittings used in connection with RTI's PEX plumbing system.

9. In approximately 1997, Uponor and/or its parent company purchased RTI, and RTI became a wholly owned subsidiary of Uponor. In early 2005, Uponor ceased doing business under the name RTI. Uponor agreed to honor RTI's product warranties after 2005.

10. Plaintiffs are ignorant of the true names and capacities of the Defendants sued herein as DOES 1 through 10, and therefore sue these Defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when they are ascertained. Plaintiffs are informed and believe that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged and that damages suffered by Plaintiffs and the proposed class, were proximately caused by their conduct.

11. Plaintiffs are informed and believe that all Defendants, including the fictitious Doe Defendants 1 through 10, were at all relevant times acting as actual agents, conspirators, ostensible agents, partners, alter egos and/or joint venturers and employees of all other Defendants and that all acts alleged herein occurred within the course and scope of that agency, employment, partnership, and/or enterprise, and with the express and/or implied permission, knowledge, consent, authorization and ratification of their co-Defendants.

12. Plaintiffs are currently unaware of which individual person(s) employed by Uponor and RTI is responsible for each of the fraudulent acts and representations alleged herein to have been committed by Uponor and RTI as a corporate entity. Plaintiffs will amend this complaint to allege the identities of such persons when their identities are ascertained.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which: (1) there are at least 100 class members in the proposed class, (2) the combined claims of the proposed class members exceed $5,000,000 exclusive of interests and costs, and (3) there is minimal diversity as Plaintiffs and members of the proposed class are citizens of the State of California and Defendants are citizens of the State of Minnesota.

14. This Court has personal jurisdiction over Defendants pursuant to 28 U.S.C. § 1391(a)(1) because Defendants purposefully availed themselves of the privilege of conducting business activities within the State of California by warranting, advertising, and selling PEX plumbing systems and defective brass insert fittings to Plaintiffs and the proposed class, and maintained systematic and continuous business contacts with the State of California, to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

15. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events, misrepresentations and/or omissions giving rise to Plaintiffs' claims alleged herein occurred in the Central District when Defendants sold, marketed, and/or warranted the Uponor and RTI PEX plumbing systems with defective brass insert fittings to Plaintiffs and the proposed class.

## FACTUAL ALLEGATIONS

### Uponor and RTI PEX Plumbing Background

16. Uponor and RTI sell various plumbing products including PEX plumbing systems and their components.

17. PEX is an acronym for cross-linked polyethylene. Polyethylene is the raw material and the "X" in the generic name "PEX" refers to the cross-linking of the polyethylene across its molecular chains.

18. For decades, plumbers and homeowners used copper piping for potable water plumbing systems. Copper is and has been accepted by virtually all plumbing codes throughout the United States.

19. Uponor, RTI, and other companies began selling alternative, non-copper plumbing products in the United States.

20. Uponor and RTI marketed and sold plumbing systems using PEX tubing for use in residential and commercial settings.

21. Uponor and RTI advertised their PEX plumbing systems as being easier to install, cheaper and longer-lasting than copper plumbing systems.

22. Uponor began marketing and selling its "AquaPEX" PEX plumbing system in 1993.

23. After it was acquired by Uponor in 1997, RTI began marketing and selling its "Plumb-Pex" PEX plumbing system.

24. On October 27, 2004, Uponor issued a press release that stated that it would close the RTI operations in early 2005. In that press release, Uponor's executive vice president, Jim Bjork, promised that Uponor would honor existing

RTI product warranties. By December 2004, Uponor began receiving RTI's product inventory, including RTI's F1807 Fittings, and began handling the ongoing purchase and distribution of RTI's Plumb-Pex system with the RTI F1807 Fittings.

25. While Uponor and RTI manufactured the PEX tubing utilized in their respective PEX plumbing systems, the Fittings sold by Uponor and RTI for use in those PEX plumbing systems were also manufactured by third parties.

26. Defendants did not disclose that they were not the designers and manufacturers of the Fittings they sold to consumers, plumbers, or plumbing distributors. Defendants instead purchased the Fittings from foreign companies, including Unique Industrial Product Company ("Unique"), a Texas based corporation.

**Yellow Brass Fittings**

27. Yellow brass Fittings are universally defective because of a well-known chemical reaction known as dezincification, which occurs when the high zinc content brass used to make the Fittings is exposed to water.

28. Brass is an alloy primarily composed of copper and zinc. When the Fittings are exposed to water, zinc leaches out of the Fittings leaving behind a weak and porous honeycomb of copper and telltale blockage of zinc oxide that inevitably leads to leaks, restricted water flow, and/or stress corrosion cracking, well in advance of the warranted useful life of the plumbing system.

29. This failure is common regardless of when, how, or where the Fittings are installed. No actions by any third party or member of the proposed Class could cause or contribute to the dezincification of the Fittings. The Fittings when used in their intended manner, installed throughout properties in California, will fail.

30. The Fittings leak and cause substantial resulting property damage to residences, thereby impairing the ability of a residence's plumbing system to effectively operate and provide water to appliances and plumbing fixtures. The Fittings begin to fail on their first day of use, even if perfectly installed in their

intended environment.

31. Defendants marketed and sold the Fittings for use in their PEX plumbing systems. The Fittings sold by Defendants were purportedly manufactured to both ASTM F1807 and F1960 Standards.

32. The F1807 and F1960 designations are made pursuant to the American Society for Testing and Materials ("ASTM") standard which relates, in part, to metal (brass) insert fittings for use in PEX tubing. When a product, or product packaging, is marked with the designation ASTM F1807 or ASTM F1960, the product is represented to have been manufactured, tested, inspected, and sampled in accordance with those standards and to have been found to meet those requirements.

**Uponor and RTI ASTM F1807 Brass Insert Fittings**

33. Defendants' PEX plumbing systems utilized brass insert fittings which purportedly conformed to ASTM F1807 ("F1807 Fittings").

34. F1807 Fittings typically use a crimp or stainless steel clamp connection design in which insert fittings made of brass alloy are inserted into the PEX tubing. The brass fittings are secured by using a special tool that crimps copper rings or stainless steel lamps around the outside of the tubing, which in turn, creates a seal between the PEX tubing and the brass fittings.

35. The crimp and stainless steel clamp system design used by Uponor and RTI for their PEX plumbing systems places a great deal of stress on the F1807 Fittings when the system is assembled as intended.

36. The design, choice of material and manufacturing methods of the F1807 Fittings also results in residual stress within the fittings following the manufacturing process but before the system is assembled in the field.

37. Beginning in July 2002, Uponor and RTI purchased F1807 Fittings from Unique with the intent and understanding that RTI and Uponor would further distribute the F1807 Fittings to wholesalers and distributors for use in their

respective PEX plumbing system installations in residential plumbing systems throughout the United States, including California, without any changes to the product.

38. The F1807 Fittings purchased from Unique are universally defective due to a chemical reaction known as dezincification, which occurs when the brass used to make the Fittings is exposed to water, and because the F1807 Fittings failed to comply with ASTM F1807 standards.

39. For some period of time, RTI sold the F1807 Fittings under its own name or label. In addition, Uponor also promoted, marketed, and sold RTI systems to, for example, the manufactured structures market.

40. In or about December 2004, Uponor began receiving deliveries of RTI's inventory of products including the Fittings supplied by Unique and agreed to honor RTI's obligations relating to parts supplied/distributed by RTI, including the Fittings.

41. The Fittings supplied by Unique were to have various markings including "F1807." and "NSF-pw." At some point in August 2002, Unique marked the Fittings sold to Uponor and RTI with the additional designation "US-PW." RTI's F1807 Fittings were also marked "P-PEX."

42. Although the exact date is unknown, shortly after Defendants began to sell the F1807 Fittings, customers began to report failures with the fittings in the form of dezincification and leaks.

43. From 2002-2006, Defendants purchased and sold millions of the defective F1807 Fittings to Plaintiffs and the Class.

**Defendants' Admissions of F1807 Fitting Defects**

44. Defendants failed to use ordinary care in inspecting, testing, marketing, distributing, and selling the F1807 Fittings Defendants sold for use in the Uponor and RTI PEX plumbing systems.

45. Sometime well in advanced of August 24, 2006, Defendants began

receiving notices of failures of F1807 Fittings supplied by Unique which were incorporated into plumbing systems in various residential properties, which failures resulted in water damage. For example, in August 2006, Defendants received reports from NVR, Inc., a large national homebuilder, that numerous F1807 fittings had failed prematurely in homes in the State of Virginia.

46. Uponor and/or RTI agreed to reimburse NVR for the cost of replacing the fittings and/or plumbing systems in more than seven hundred homes. The cost of those replacements totaled approximately $5 million.

47. Although the exact dates are currently unknown to Plaintiffs, Defendants also received similar reports of F1807 Fittings prematurely failing across the United States, including, but not limited to, reports in Minnesota, Wisconsin, Washington, Oregon, Utah, Montana, Missouri, Vermont, Iowa, Michigan, Louisiana, Idaho, Indiana.

48. As a result of the premature failures of the F1807 Fittings, Defendants stopped selling F1807 fittings at a date currently unknown to Plaintiff but believed to be January 2007.

49. In *Uponor, Inc. and Radiant Technology, Inc. v. Unique Industrial Product Company, et al.*, U.S. District Court, Southern District of Texas, Case No. 07-2986 ("Unique Complaint"), filed on September 17, 2007, Defendants admit the F1807 Fittings they purchased from Unique for use in their PEX plumbing systems were defective. A true and correct copy of the Unique complaint is attached hereto as **Exhibit A.**

50. Defendants allege in the Unique Complaint that the F1807 Fittings sold by Uponor and RTI:

a. were not free from defects in materials, design, and workmanship (Unique Complaint, ¶ 61);

b. were not merchantable, or suited for their reasonable, expected, and intended use in residential plumbing systems (Unique

Complaint, ¶ 61);

c. were not fit for the ordinary purposes for which such goods are used and would not pass without objection in the trade as evidenced by multiple failures of the goods when put to their ordinary and intended uses (Unique Complaint, ¶ 69);

d. fail to comply with ASTM F1807 standards including chemical composition, poor micro-structure, pre-existing cracks, and excessive porosity (Unique Complaint, ¶ 88); and

e. were defective at the time they were sold (Unique Complaint, ¶ 88).

51. As part of the Unique Complaint, Uponor submitted a report by Cynthia L. Smith, an engineer and former employee of Uponor, who concluded that the fittings were failing because of stress corrosion cracking that was the result of improper manufacturing practices and off-specification materials. A copy of Ms. Smith's report is attached hereto as **Exhibit B**.

52. Ms. Smith also concluded (after analyzing F1807 Fittings that had never been installed and were in their original bag) that the F1807 Fittings Defendants purchased from Unique and sold to the public by Defendants had not failed because of installation practices or water conditions (as failures occurred in multiple states with varying water chemistry conditions), but due to manufacturing, materials, and other defects.

53. Uponor also submitted the report of Thomas Egar, an engineer, who concluded that the F1807 Fittings failed to comply with ASTM F1807, were defectively manufactured and fail prematurely because of improper machining practices, improper alloy composition, and microstructure. A copy of Mr. Egar's report is attached as **Exhibit C**.

54. During 2006, Defendants sought reimbursement from Unique for the money Defendants paid as a result of premature failures of the F1807 Fittings.

55. In seeking reimbursement from Unique, Defendants claimed that the F1807 Fittings Uponor and RTI had obtained from Unique, and which Uponor and RTI sold to the public, were defectively designed or manufactured.

56. Plaintiff is informed that Unique agreed to reimburse Uponor for any claims resulting from the defective F1807 Fittings.

57. Plaintiff is informed that, among other things, Uponor agreed to take Unique's remaining inventory of brass fittings and in exchange Unique would "take care of the existing claims plus stand behind any future claims.

58. Uponor now publicly criticizes the design of F1807 Fittings in Uponor's *Fitting Systems Fact Sheet*, a document currently available on its website, as follows:

a. "Thinner wall offers less resistance to stress and corrosion."

b. "Smaller cross-sectional area restricts flow."

c. "Does not take advantage of the properties of PEX-a tubing."

d. "Requires testing every copper crimp fitting connection."

e. "Can be dry fit – could result in uncrimped connections."

Attached hereto as **Exhibit D** is a true and correct copy of the Fitting Systems Fact Sheet.

59. Because of their defective design and manufacture, Defendants' F1807 Fittings are inherently defective and are substantially certain to cause the PEX plumbing system to fail within the 25 year express warranty and/or the useful life of the plumbing system. Plaintiffs and the proposed class own, have installed, or have paid for damages caused by Defendants' defective F1807 Fittings that have already prematurely failing or are in the process of failing prematurely, and/or have suffered or are reasonably certain to suffer lost money, property and injury-in-fact well in advance of the warranted and expected 25 year life of their plumbing systems.

**Uponor F1960 Fittings Defect**

60. In addition to the F1807 Fittings sold by Uponor for use in their AquaPex plumbing system, Uponor also marketed and sold Fittings manufactured to ASTM F1960 ("F1960 Fittings") for use in their PEX plumbing system. The F1960 Fittings were advertised as being superior to the previous F1807 Fittings.

61. The F1960 Fittings sold by Uponor contain the same defects as the F1807 Fittings because they are subject to dezincification from the yellow brass used to make the F1960 Fittings when exposed to water.

62. Numerous Uponor PEX plumbing systems have failed as a result of the defective F1960 Fittings.

63. Uponor's F1960 Fittings were sold under various trade names including "ProPex."

**False Advertising of PEX Plumbing Systems**

64. Defendants most often sold its PEX plumbing systems to initial purchasers who were distributors of the Uponor and RTI PEX plumbing systems and Fittings (the "Initial Purchasers"). The Fittings purchased by the Initial Purchasers were ultimately installed in properties owned or constructed by Plaintiffs and other members of the Class.

65. To promote and induce the purchase of its products, Defendants expressly warranted to the Initial Purchasers, Plaintiffs and the Class, by advertisement, literature, and other means, that Defendants' PEX plumbing systems and Fittings were merchantable, met relevant industry standards, and were fit for the ordinary purpose for which such products were sold.

***Uponor Representations***

66. Uponor represented and warranted in its marketing materials that the AquaPEX system is durable, reliable, stress and chemical resistant, and resistant to aggressive water and soils.

67. Uponor also expressly warranted and advertised that their AquaPEX plumbing system would be free of damage resulting from defects in material and workmanship for at least 25 years.

68. Uponor also represents that the AquaPEX plumbing system does not corrode, is leak-resistant, not affected by corrosive water and soil conditions, and that the AquaPEX system will last the life of the building structure.

***RTI Representations***

69. On RTI's web site, www.radiant-tech.com, RTI falsely claimed in 1998 that its Plumb-Pex system was proven, reliable and completely safe for consumers. RTI knew that this statement was false and misleading because, among other things, RTI did not design, manufacture, or test the Fittings they purchased from third parties for use in their Plumb-Pex system. RTI had no idea whether the Plumb-Pex system was as reliable as they advertised to the public.

70. RTI continued to make these false statements on the www.radiant-tech.com web site until at least the fall of 2002. RTI then continued to make the same or similar false statements on RTI's new web site, www.rti-systems.com, until the fall of 2004.

71. On RTI's web site, www.radiant-tech.com, Defendants falsely claimed in 1998 that "Our Plumb-Pex system is a carefully engineered flexible piping system that provides a durable, proven, and guaranteed solution to all your plumbing needs. RTI maintains the highest quality standards in the industry."

72. In addition to the representations made in their advertising materials and on their web sites, every one of the F1807 Fittings sold by Defendants had a stamp on the side of the fitting which indicated that the fittings conformed to ASTM F1807.

73. However, Defendants' F1807 Fittings did not comply with various aspects of the F1807 requirements including alloy composition and dimensions. Defendants knew or should have known that their advertising statements about

compliance with ASTM standards were false and that their certification of compliance with ASTM F1807 by stamping the designations on the fittings was false.

74. At a date as of yet unknown to Plaintiffs, Defendants were placed on notice that the F1807 and F1960 Fittings were defective. Notwithstanding this notice that the Fittings were defective, failing, and would continue to fail, Defendants failed to notify their customers and continued to sell a vast amount of the defective F1807 and F1960 Fittings, without disclosing the known defect.

75. At all times and in all communications with consumers, suppliers and contractors, Defendants and their representatives misled consumers into believing that the brass insert fittings in their PEX plumbing systems complied with ASTM standards.

76. Plaintiffs, their representatives and other consumers relied on Defendants' misrepresentations because the F1807 Fittings and F1960 Fittings could not have been used in potable water systems in the United States without compliance with those standards. Defendants, therefore, falsely represented that the F1807 Fittings and F1960 Fittings were of a particular quality, standard or grade, when they were not.

77. Defendants, and its authorized agents and sales representatives, made the above-described assertions, statements, representations, and warranties with the intent and purpose of inducing plumbing suppliers to buy the AquaPEX and/or Plumb-Pex plumbing systems and F1807 Fittings and/or F1960 Fittings from Defendants to install in properties throughout California and other states.

78. When Defendants and their representatives made each of the affirmative misrepresentations outlined above, Defendants knew, or were reckless in not knowing, that the representations were false and misleading.

79. Defendants knew or were reckless in not knowing, that their PEX plumbing systems did not conform to these representations because of their failure

to adequately test the F1807 Fittings and/or F1960 Fittings sold by Defendants for use in their PEX plumbing systems.

**Defendants' Omissions About the Fittings**

80. Defendants made numerous material omissions relating to the design, reliability, and performance of the Fittings sold by Uponor and RTI for use in their PEX plumbing systems.

81. Among these omissions was the failure to inform purchasers and consumers about: (1) tendency for the Fittings to fail because of dezincification or stress corrosion cracking, (2) that Defendants and their suppliers had done little or no testing to determine whether these fittings and the systems in which they were used would perform well in real world conditions, and (3) that Defendants lacked quality control over the design and manufacturing processes used by third parties like Unique to make the Fittings.

82. Each of the misrepresentations and omissions were repeatedly made by Defendants' sales personnel as well as Defendants' manufacturing representatives. Further all of the sales and product literature provided by Defendants in marketing materials and on their websites omitted the material facts recited herein.

83. Had Defendants not withheld and omitted this material information about the design, reliability and performance of their Fittings, Plaintiffs and the proposed Class would not have purchased those products or allowed them to be installed in their homes or properties.

**Plaintiffs' Experience**

84. Plaintiffs had the defective Fittings installed throughout their home as part of their PEX plumbing system. Plaintiffs did not become aware of the falsity of the representations and warranties made by Defendants until approximately March 3, 2010, when the PEX plumbing system failed at Plaintiffs' home causing damage to property other than the plumbing system.

85. Plaintiffs contacted Good News Plumbing & Drains ("Good News") to fix the broken plumbing system. Good News found a leak behind the water heater in the home at the PEX brass fitting. The brass fitting was stamped with various markings including, but not limited to, "P-PEX" and "F1807." Good News repaired the leak and recommended Plaintiffs either (1) re-pipe the entire home to prevent further issues/property damage, or (2) replace their entire hot water system from Plaintiffs' water heater to individual angle stops and shower control values, and re-insulate the pipe.

## STATUTES OF LIMITATION

86. **Discovery Rule.** Prior to failing and leaking, the defective nature of the PEX plumbing system is not perceptible to Initial Purchasers, Plaintiffs and members of the proposed class. Plaintiffs did not become aware that they had suffered loss of money, property, and damages caused by the defective Fittings until their PEX plumbing system failed on or about March 12, 2010.

87. **Fraudulent Concealment Tolling.** Any applicable statutes of limitation have been tolled by Defendants' knowing and active concealment of the facts as alleged herein. Plaintiffs and the proposed class have been kept ignorant by Defendants of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiffs and members of the proposed class could not reasonably have discovered the dezincification problems with the Fittings on their own.

88. **Estoppel.** Defendants estopped from relying on any statutes of limitation in defense of this action. For the reasons described in paragraph 128 below, Defendants were under a continuous duty to disclose to Plaintiffs and the proposed class the true character, quality and nature of the Fittings. Defendants knowingly and affirmatively misrepresented and actively concealed the true character, quality, and nature of the Fittings. Plaintiffs reasonably relied upon Defendants' knowing and affirmative representations and/or active concealment.

## CLASS ACTION ALLEGATIONS

89. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all others similarly situated (the "Class").

90. The Class which Plaintiffs seek to represent in this action is defined as follows:

> **Nationwide Class:** "All persons and entities who own properties in which defective Uponor/RTI F1807 and/or F1960 yellow brass fittings were installed from January 1, 1999 to the present, or who replaced some or all of said defective Uponor/RTI plumbing systems."

> **Nationwide Fraud Sub-Class:** All persons and entities who own properties in which defective Uponor/RTI F1807 and/or F1960 yellow brass fittings were installed after the date Uponor/RTI were on notice that said products were defective, including fraud sub-class members who have replaced some or all of said defective Uponor/RTI plumbing systems.

91. The following persons shall be excluded from the Class: (1) Uponor and their subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from the proposed Class; (3) governmental entities; and (4) the judge(s) to whom this case is assigned and any immediate family members thereof.

92. Plaintiffs reserve the right to modify or amend the Class definition, as appropriate.

93. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims, and because this case meets the requirements of Federal Rule of Civil Procedure 23.

94. **<u>Numerosity Under Rule 23(a)(1)</u>**. The members of the Class are so numerous that individual joinder of all the members is impracticable. Plaintiffs are informed and believe that there are at least thousands of purchasers who have been damaged by Defendants' conduct, as alleged herein.

95. **<u>Commonality and Predominance Under Rule 23(a)(2) and (b)(3)</u>**. This action involves common questions of law and fact, which predominate over any questions affecting individual class members, including, but not limited to, the following.

a. Whether Defendants violated California's Unfair Competition Law, Bus. & Prof. Code § 17200, et seq., by, among other things, engaging in unfair, unlawful, or fraudulent practices;

b. Whether Defendants violated California's Unfair Competition Law, Bus. & Prof. Code § 17200, et seq., and/or False Advertising Law, Bus. & Prof. Code § 17500, et seq., by, among other things, falsely advertising that their PEX plumbing system and components were of a certain standard, quality, and grade when in fact, they were not;

c. Whether Defendants have been unjustly enriched as a result of the conduct complained of herein;

d. Whether Plaintiffs and the Class are entitled to equitable relief, including but not limited to injunctive relief and restitution.

e. Whether Defendants violated California's Consumer Legal Remedies Act (California Civil Code §§ 1750 *et seq.*), when they concealed or failed to disclose either through their advertising, warranties and other express representations, the true nature of the Fittings, and represented, through their advertising, warranties and other express representations that the Fittings had characteristics that they did not actually have;

f. Whether the Fittings are subject to dezincification and premature failure well in advance of their represented twenty-five year useful life,

and are not suitable for use as a long-term plumbing product;

g. Whether Defendants knew or should have known that their PEX plumbing system and Fittings were defective;

h. Whether Defendants had a duty to Plaintiffs and the Class to disclose the true nature of the PEX plumbing system and Fittings;

i. Whether Defendants falsely represented that their PEX plumbing system and Fittings were of a certain standard, quality, and grade, when in fact, they were not;

j. Whether Defendants concealed material information regarding the true characteristics and defective nature of their products;

k. Whether Defendants' false representations and concealment of the defective nature of their plumbing system and Fittings was knowing, intentional, reckless, and/or malicious.

l. Whether Plaintiffs and the Class are entitled to actual, statutory, punitive, exemplary, and/or other forms of damages, and/or other monetary relief and, if so, in what amount;

m. Whether Defendants breached their express warranties to Plaintiffs and the Class.

n. Whether Defendants breached their implied warranties to Plaintiffs and the Class.

96. **Typicality Under Rule 23(a)(3).** The named Plaintiffs' claims are typical of the claims of the Class because, among other things, Plaintiffs, like all Class members, purchased the PEX plumbing systems with the defective yellow brass Fittings, or purchased residences or commercial property in which the defective PEX plumbing systems were installed and marketed and sold by Defendants, and were damaged as a result. The universally defective nature of the yellow brass Fittings renders each Class member's claims, legal theory, and injury common and typical.

97. **Adequacy of Representation Under Rule 23(a)(4)**. Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the proposed Class. Plaintiffs have retained counsel competent and experienced in complex class actions involving building products and product liability, and intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

98. **Superiority Under Rule 23(b)(3).** A class action is superior to all other available means for the fair and efficient adjudication of this controversy in that:

a. The prosecution of separate actions by individual members of the Class would create a foreseeable risk of inconsistent or varying adjudications which would establish incompatible results and standards for Defendants;

b. Adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their own separate interests;

c. Class action treatment avoids the waste and duplication inherent in potentially thousands of individual actions, and conserves the resources of the courts; and

d. The claims of the individual Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for the members of the Class to individually seek redress for Defendants' wrongful conduct. Even if the members of the Class could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive

supervision by a single court.

99. **Injunctive Relief Under Rule 23(b)(2)**. Defendant Uponor engaged and continues to engage in business practices which are unfair, unlawful and/or fraudulent in violation of California's Unfair Competition Law (Business & Professions Code sections 17200 *et seq.*) and the False Advertising Law (Business & Professions Code sections *17500 et seq.*) by, among other things, advertising and representing that the PEX plumbing system and F1960 Fittings have characteristics and benefits that they do not.

100. Plaintiffs seek class-wide injunctive relief on behalf of the proposed Class, pursuant to Rule 23(b)(2), in that Uponor has acted, by continuing to advertise their PEX plumbing system with yellow brass F1960 Fittings, and omitting to disclose material facts regarding the F1960 Fittings, on grounds consistent with the standards articulated in Rule 23(b)(2) that make final injunctive relief an appropriate class-wide remedy.

101. **Class Notice (Central District Local Rule 23-2.2(g))**. Plaintiffs cannot be certain of the form and manner of class notice it will propose until the class is finally defined and some discovery concerning the identity of Class members is undertaken. Based on the experience of its counsel in previous cases, however, Plaintiffs anticipate that notice by mail will be given to all Class members who can be identified specifically and that this notice will be supplemented by notice published in appropriate periodicals, notice published on the Internet and by press releases and similar communications to relevant industry and trade groups.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### (Violation of Consumers Legal Remedies Act)

102. Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though alleged in full herein.

103. Plaintiffs and the members of the Class are "consumers" as defined by

Civil Code § 1761(d).

104. Uponor, RTI, and Doe Defendants are "persons" as defined by Civil Code § 1761(c).

105. The Fittings are "goods" as defined by Civil Code § 1761(a).

106. Plaintiffs and the Class members' purchases of the Fittings and/or homes in which the Fittings are installed, are "transactions" as defined by Civil Code § 1761(e).

107. The Consumers Legal Remedies Act ("CLRA"), Civil Code § 1770, *et seq.*, deems the following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer as unlawful:

a. "Representing that goods...have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have." Civil Code § 1770(a)(5).

b. "Representing that goods...are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Civil Code § 1770(a)(7).

108. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Civil Code §§ 1770(a)(5) and (a)(7) when they represented, through their advertising and other express representations, that the Fittings had benefits or characteristics that they did not actually have.

109. Defendants further violated the CLRA when they falsely represented that their PEX plumbing system was of a certain standard or quality.

110. Finally, Defendants violated the CLRA when they advertised their PEX plumbing system with the intent not to sell it as advertised.

111. Defendants' deceptive practices were specifically designed to induce Plaintiffs and members of the Class to purchase their products.

112. Defendants engaged in marketing efforts as alleged herein, to reach Class Members, their agents, and/or third parties upon whom they relied, to persuade them to purchase and install the PEX plumbing system manufactured by Uponor or RTI, or to purchase homes and other structures in which the defective PEX plumbing system manufactured by Uponor or RTI had been installed.

113. To this day, Defendants continue to engage in unlawful practices in violation of the CLRA. Defendants continue to conceal the defective nature of the Fittings, and have omitted to disclose upon inquiry from Class members the PEX plumbing system's defective propensities.

114. Plaintiffs served Uponor and RTI with notice of their violations of the CLRA by serving notice by certified mail on their agents for service of process and their corporate offices, on December 15, 2010. A copy of this notice is attached hereto as **Exhibit E**.

115. Venue is proper pursuant to Civil Code § 1780(c) because Defendants do business in this county. Attached hereto as **Exhibit F** is the Declaration of Paul Roth, establishing this Court as the proper venue for this action.

116. Plaintiff on behalf of himself and for all others similarly situated, demands that a permanent injunction be issued against Defendants to refrain from continued advertising that omits material facts about the defective PEX plumbing system Fittings, injunctive relief forcing Defendants to replace and repair all PEX plumbing systems with the defective Fittings for Class Members, consequential damages for Class Members who have replaced or will replace the PEX plumbing system as a result of the defective Fittings, plus costs and attorneys' fees pursuant to Civil Code § 1780(d).

## SECOND CLAIM FOR RELIEF

### (Violation of Unfair Competition Law)

117. Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though alleged in full herein.

118. Pursuant to Bus. & Prof. Code § 17200, "unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

119. Defendants' actions, as alleged herein, constitute deceptive, unfair, fraudulent, and unlawful practices committed in violation of the Bus. & Prof. Code § 17200, *et seq*.

120. All of the conduct and misrepresentations alleged herein occurred in the course of Defendants' business and was part of a pattern or generalized course of conduct.

121. Defendants' deceptive, unfair, fraudulent, and unlawful conduct alleged herein was specifically designed to and did induce Initial Purchasers, Plaintiffs, or Plaintiff's agents, representatives, or builders/installers, and the Class to purchase their PEX plumbing system and Fittings for use and installation in their homes and other structures.

122. Plaintiffs and the Class reasonably and justifiably relied on Defendants' deceptive, unfair, fraudulent, and unlawful conduct alleged herein.

123. As a direct and proximate cause of Defendants' unfair methods of competition and unfair or deceptive acts or practices, Plaintiffs and the Class have suffered injury-in-fact, lost money, and lost property, in that they own or owned properties in which the defective Fittings are or were installed. The Uponor and RTI PEX plumbing systems will prematurely fail due to corrosion and dezincification, which will require (or has already required) Plaintiffs and the Class to incur costs to prematurely repair and/or replace their PEX plumbing systems.

124. Pursuant to Bus. & Prof. Code §§ 17203, 17204, Plaintiffs and the Class seek to recover from Defendants restitution and disgorgement of earnings, profits, compensation and benefit obtained as a result of the practices that are unlawful under Bus. & Prof. Code § 17200 *et seq*., according to proof.

125. The unfair and fraudulent business practices of Defendants set forth

herein are likely to continue and therefore will continue to mislead the public, and present a continuing threat to the public. Plaintiffs therefore request a permanent injunction as set forth in the Prayer for Relief below.

## THIRD CLAIM FOR RELIEF

## (Violation of False Advertising Law)

126. Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though alleged in full herein.

127. The FAL provides,

"It is unlawful for any…corporation…with intent directly or indirectly to dispose of real or personal property…or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, …any statement, concerning that real or personal property…or concerning any circumstance or matter of fact connected with the proposed…disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading…or …to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell that personal property…as so advertised. " Bus. & Prof. Code § 17500.

128. Defendants violated the FAL by, among other things, disseminating unfair, deceptive, untrue and/or misleading marketing, advertising and other broadly disseminated representations that the plumbing system and Fittings met had certain characteristics and were of a certain standard, quality, and grade, when in fact, they were not.

129. Uponor misrepresentations deceived and were likely to deceive Plaintiffs and the Class.

130. As a direct and proximate result of the violations of the FAL described above, Plaintiffs and the Class have suffered injury-in-fact, lost money, and lost property, because Plaintiffs and the Class would not have installed Defendants' PEX plumbing systems and Fittings in their homes, or purchased homes where the defective F1807 Fittings are installed, but for Defendants' statements indicating the PEX plumbing system was of a certain standard, quality, and grade, and those PEX plumbing systems have failed or are in the process of failing due to the defective nature of the Fittings.

131. Defendants have been unjustly enriched by their receipt of monies from Plaintiffs and the Class who purchased Defendants' defecting fittings.

132. Pursuant to Bus. & Prof. Code § 17535, Plaintiffs and the Class seek to recover from Defendants restitution and disgorgement of earnings, profits, compensation and benefit obtained as a result of the practices that are unlawful under Bus. & Prof. Code § 17500 *et seq*., according to proof.

## FOURTH CLAIM FOR RELIEF

## (Unjust Enrichment/Restitution)

1. Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though alleged in full herein.

2. To the detriment of Plaintiffs and the Class, Defendants have been unjustly enriched as a result of the unlawful and/or wrongful collection of, *inter alia*, payments for substandard and defective Fittings for use in their PEX plumbing systems.

3. It would be inequitable and unjust for Defendants to retain any profits, benefits, or other money it obtained from their wrongful conduct.

4. Accordingly, Plaintiffs and the Class seek full restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of Defendants' unfair, fraudulent, and unlawful conduct alleged herein, according to proof.

**FIFTH CLAIM FOR RELIEF**

**(Breach of Implied Warranty)**

133. Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though alleged in full herein.

134. The sale of the PEX plumbing systems and Fittings between Defendants and the Initial Purchasers included warranties implied in the law that Defendants' PEX plumbing system products were merchantable, met industry standards, and were fit for the ordinary purpose for which such products were sold (the "Implied Warranties").

135. Defendants breached the Implied Warranties by manufacturing and selling PEX products that were (1) not fit for use as a plumbing system in homes and other structures, (2) the PEX plumbing system as designed, manufactured, advertised and sold was not of a merchantable quality; and (3) the PEX plumbing system was unfit for their intended use in that the Fittings are defective and significantly reduce the warranted useful life of the product.

136. As a direct and proximate result of Defendants' breach of the Implied Warranties, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

**SIXTH CLAIM FOR RELIEF**

**(Breach of Express Warranty)**

137. Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though alleged in full herein.

138. In order to promote and induce the purchase of its products, Defendants expressly warranted to Initial Purchasers, Plaintiffs and the Class, by advertisement, literature, and other means, that Defendants' PEX plumbing systems and Fittings were merchantable, met relevant industry standards, and were fit for the ordinary purpose for which such products were sold.

139. Defendants and the Initial Purchasers intended that all express and

implied warranties were for the benefit of Plaintiffs and Class Members, the owners of the properties where the PEX plumbing systems are installed. Defendants contracted with the Initial Purchasers to supply the PEX tubing and Defendant's F1807 and/or F1960 Fittings Fittings to be installed in properties owned by Plaintiffs and the Class. The express and implied warranties would be of no economic value to the Initial Purchasers unless the ultimate owner of the properties containing Defendants' PEX plumbing system, Plaintiffs and the Class, received the benefit of such warranties.

140. These express warranties formed part of the basis of the bargain between Defendants, on one hand, and Initial Purchasers, Plaintiffs and the Class, on the other.

141. Defendants breached their express warranties by selling F1807 Fittings and/or F1960 Fittings for use in their PEX plumbing system that were: (1) not manufactured to industry standards or the specifications referenced on the products; (2) not of merchantable quality; and (3) unfit for their intended use as they are reasonably certain to fail well before the 25 year warranty and/or useful life of the system.

142. As a result of Defendants' breaches of its express warranties, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

143. Defendants received timely notice of the breach of warranty alleged herein by reason of its own knowledge of the defective Fittings, the assertion by Class members of claims, the filing of the *McGregor, et al. v. Uponor, Inc., et al.*, U.S. District Court, District of Minnesota, Case No. 09-1136, the filing of *Slaughter v. Uponor, Inc.*, U.S. District Court, District of Nevada, Case No. 2:08-CV-01223-RCJ (GWF), this Complaint, and Plaintiff's Consumers Legal Remedies Act ("CLRA") Notice dated December 15, 2010 issued pursuant to Civil Code section 1782.

144. By reason of the foregoing, Plaintiffs, on behalf of themselves and all

others similarly situated, demand judgment against Defendants for damages, including compensatory, incidental and consequential damages (excepting damages for personal injuries) for itself and each member of the Class.

## SEVENTH CLAIM FOR RELIEF

### (Fraudulent Concealment)

145. Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though alleged in full herein.

146. Defendants knowingly concealed and intentionally failed to disclose to Plaintiffs and the Class the facts that: (1) the F1807 Fittings they sold to the public did not comply with ASTM F1807 as represented, (2) that the F1960 Fittings were defective, and (3) that brass insert fittings are highly susceptible to dezincification. This information was material to Plaintiffs and the Class and was concealed by Defendants to induce Initial Purchasers, Plaintiffs and their agents, representatives, builders, and installers, and the Class to purchase Defendant's PEX plumbing systems.

147. At all relevant times, Defendants had exclusive knowledge of material facts not known to Plaintiffs and the Class, actively concealed these facts from the Plaintiffs and the Class, and made representations concerning the reliability of brass insert fittings which were materially misleading in light of the facts it suppressed.

148. Defendants intended for Plaintiffs and the Class to rely on Defendants' omissions regarding the quality of their PEX plumbing systems. Defendants knew that had Defendants disclosed the true facts as alleged herein, Initial Purchasers, Plaintiff and the Class would not have purchased Defendants' PEX plumbing systems with Uponor and RTI F1807 Fittings.

149. Plaintiff and the Class were unaware that the F1807 Fittings and/or F1960 Fittings sold by Defendants for use in their PEX plumbing systems were defective, did not meet industry standards, and were susceptible to dezincification. Had Plaintiffs and the Class been aware of Defendants' omissions concerning the

F1807 Fittings and/or F1960 Fittings, they would not have purchased Defendants' F1807 Fittings and/or F1960 Fittings for use in Defendants' PEX plumbing systems.

150. As a proximate result of Defendants' material omissions of fact as alleged herein, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray that the Court certify the Class, as defined hereinabove, enter judgment against Defendants and in favor of Plaintiffs and the Class, and award the following relief:

1. An Order certifying this action as a Class Action (and certifying any appropriate subclasses), appointing Plaintiffs as Class Representatives and their counsel of record jointly as Class Counsel;

2. For restitutionary relief consisting of:

a. An accounting against the Defendants for all sums collected from Plaintiffs and the Class for the purchase of Defendants' PEX plumbing systems with defective F1807 Fittings and/or F1960 Fittings;

b. The imposition of a constructive trust for all such sums;

c. For restitution and/or disgorgement of revenues, earnings, profits, compensation, and benefits which were received by Defendants as a result of such unlawful business acts or practices, according to proof;

3. Injunctive relief;

a. A declaration that Defendants are financially responsible for notifying all Class Members;

4. Actual damages, punitive damages, and such other relief as provided by the law;

5. Pre-judgment and post-judgment interest on such monetary relief;

6. For Plaintiffs' attorneys' fees;

7. For costs of bringing suit; and

8. All other relief to which Plaintiff and the Class may be entitled at law or in equity and which the Court deems appropriate

Dated: January 21, 2011

Respectfully submitted,

BIRKA-WHITE LAW OFFICES

By: ______________________
David M. Birka-White

David M. Birka-White (State Bar No. 85721)
Mindy M. Wong (State Bar No. 267820)
BIRKA-WHITE LAW OFFICES
411 Hartz Avenue, Suite 200
Danville, CA 94526
Telephone: (925) 362-9999
Facsimile: (925) 362-9970

Michael F. Ram (State Bar No. 104805)
mram@ramolson.com
RAM & OLSON
555 Montgomery Street, Suite 820
San Francisco, CA 94104
Telephone: (415) 433-4949
Facsimile: (415) 433-7311

*Attorneys for Individuals and Representative Plaintiffs* PAUL ROTH and LYNN ROTH

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs, individually and on behalf of all others similarly situated, hereby demand a jury trial.

Dated: January 21, 2011

Respectfully submitted,

BIRKA-WHITE LAW OFFICES

By: ______________________
David M. Birka-White

David M. Birka-White (State Bar No. 85721)
Mindy M. Wong (State Bar No. 267820)
BIRKA-WHITE LAW OFFICES
411 Hartz Avenue, Suite 200
Danville, CA 94526
Telephone: (925) 362-9999
Facsimile: (925) 362-9970

Michael F. Ram (State Bar No. 104805)
mram@ramolson.com
RAM & OLSON
555 Montgomery Street, Suite 820
San Francisco, CA 94104
Telephone: (415) 433-4949
Facsimile: (415) 433-7311

*Attorneys for Individuals and Representative Plaintiffs* PAUL ROTH and LYNN ROTH

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| UPONOR, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CASE NO. 07-2986 |
| | § | |
| UNIQUE INDUSTRIAL PRODUCT COMPANY, | § | |
| | § | |
| | § | |
| Defendant | § | |

**PLAINTIFF'S AMENDED COMPLAINT**

NOW COMES Plaintiff UPONOR, INC. (hereinafter "UPONOR") and files this Amended Complaint against Defendant UNIQUE INDUSTRIAL PRODUCT COMPANY (hereinafter "UNIQUE') and respectfully shows as follows:

**PARTIES**

1. RTI Piping Systems ("RTI") was a company located at 11 Farber Drive, Bellport, N.Y. 11713. RTI was engaged in the business of supplying/distributing various plumbing products including, but not limited to, brass Fittings and toilet Swivel Nuts.

2. At all times relevant, Plaintiff UPONOR was and is a corporation incorporated in Illinois with its principal place of business located at 5925 148th Street West, Apple Valley, Minnesota. UPONOR was and is both a citizen and a resident of Minnesota. UPONOR is engaged in the business of supplying/distributing various plumbing products including, among other products, brass plumbing Fittings as well as toilet Swivel Nuts, and was authorized to conduct business in Texas.

3. UPONOR and RTI were related companies. In or about December 2004 UPONOR began receiving deliveries of RTI's inventory of products, including SSC Fittings and toilet Swivel Nuts. In or about December 2004 UPONOR agreed to honor RTI's warranty obligations relating to parts supplied/distributed by RTI, including brass Fittings and Swivel Nuts.

4. Upon information and belief, at all times relevant, Defendant UNIQUE was and is a Texas corporation with its principal place of business located at 12600 Cardinal Meadows, Sugarland, Texas, and was acting as a domestic agent, apparent manufacturer, importer, supplier/distributor and marketer of plumbing products including, among other products, ASTM F1807 brass plumbing Fittings and polyacetyl toilet Swivel Nuts. At all times relevant, UNIQUE was doing business in the State of Texas, and was both a citizen and a resident of Texas.

## **JURISDICTION AND VENUE**

5. This Court has original jurisdiction of this action pursuant to 28 U.S.C. Section 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

6. Venue is proper in this jurisdictional district pursuant to 28 U.S.C. Section 1391(a)(2) and (f)(1) as UNIQUE is doing business in this jurisdictional district.

## **PRELIMINARY ALLEGATIONS**

7. On or about July 31, 2002 RTI began doing business with UNIQUE and submitted a purchase order for brass pex Fittings. In August 2002, in e-mails and telefaxes, RTI required, and UNIQUE agreed, that the brass pex Fittings to be supplied by UNIQUE would have various markings including: F1807, P-PEX and NSF-pw. Subsequent to the August 2002

date UNIQUE was instructed to, and did, mark the Fittings sold to RTI and UPONOR with the additional designation "US-PW".

8. The F1807 designation is made pursuant to the American Society of Mechanical Engineers (ASTM) standards which relate, in part, to metal (brass) insert Fittings for use with Pex tubing. Pursuant to sub-paragraph 11.1 of F1807-045 when a product, or product packaging, is marked with the ASTM designation F1807 the product is represented to have been manufactured, tested, inspected and sampled in accordance with F1807 and has been found to meet F1807 requirements.

9. ASTM F1807-045 references B283 Specifications for Copper and Copper-Alloy Die Forgings which encompasses the brass Fittings supplied by UNIQUE. The B283 Specifications provide among other points, in paragraph 7 that forgings, including the Fittings supplied by UNIQUE shall conform to the chemical composition requirements set forth in Table 1 attached to B283.

10. UNIQUE selected Duksan Metal Co. of Korea to design, engineer and manufacture the Fittings. Neither RTI nor UPONOR participated in the selection of Duksan nor did they have contact with Duksan relating to the means, methods or circumstances regarding the manufacture of the Fittings. The Fittings were delivered by Duksan to UNIQUE.

11. On information and belief UNIQUE did not have a representative present at Duksan's facility on a full time basis to monitor the manufacturing process and ensure that the production runs, as opposed to prototype product, was in compliance with ASTM and industry standards.

12. Subsequent to its commitment in July 2002 to supply brass Fittings to RTI, UNIQUE agreed to provide RTI and UPONOR with Swivel Nuts.

13. UNIQUE chose Duksan to engineer, design and manufacture the Swivel Nuts. Duksan sub-contracted part of the work on the Swivel Nuts. On information and belief UNIQUE never inspected the Swivel Nut sub-contractor's facility, never investigated the qualifications of the sub-contractor and never monitored the sub-contractor's work.

14. Neither RTI nor UPONOR knew who the Swivel Nut sub-contractor was, nor how the Swivel Nuts were being manufactured.

15. During or before June 2004 UNIQUE was placed on notice by UPONOR of failures of Swivel Nuts, the fact that UNIQUE's competitors' nuts were not failing and that UPONOR was losing business as a result of this situation.

16. Subsequent to June 2004, UNIQUE began supplying other Swivel Nuts to UPONOR (the "post June 2004 nuts"). UNIQUE did not monitor or supervise production of the post June 2004 nuts, did not test the post June 2004 nuts before supplying them to UPONOR to determine what degree of porosity was present in the walls of the nuts, nor did UNIQUE examine the thread pattern of the nuts for deficiencies.

17. The Swivel Nuts were purchased from UNIQUE, by RTI and UPONOR, with the intent and understanding that those Swivel Nuts would be further distributed by RTI and UPONOR to other entities for installation in residential plumbing systems. During and after the discussions/negotiations relating to the sale of the Swivel Nuts, UNIQUE understood that RTI and UPONOR would be acting as intermediate distributors of the Swivel Nuts and would be passing that product along to wholesalers and end users without any changes to the product.

18. During and after the discussions/negotiations relating to the sale of the Swivel Nuts, UNIQUE presented itself to RTI and UPONOR as knowledgeable regarding that product, represented that it was in the business of selling such products, and RTI and UPONOR relied on

UNIQUE's experience and knowledge relating to the Swivel Nuts. Further, UNIQUE agreed to provide goods that were free from defects in workmanship, materials, or design, and which were merchantable and fit for their intended purpose of incorporation into residential plumbing systems.

19. Pursuant to the understandings and agreements set forth in paragraphs 17 and 18 above, UNIQUE began shipping the subject Swivel Nuts to RTI and UPONOR.

20. Prior to the date on which RTI and UPONOR began purchasing the Swivel Nuts from UNIQUE, RTI and UPONOR had entered into agreements with various wholesalers to supply Swivel Nuts for use in residential plumbing throughout the United States. Subsequent to the date of UNIQUE's sale of the Swivel Nuts to RTI and UPONOR, RTI and UPONOR supplied UNIQUE's Swivel Nuts to other entities, including wholesalers. RTI and UPONOR made no changes or alterations to UNIQUE's Swivel Nuts and simply re-distributed UNIQUE's product in the same condition in which it was supplied by UNIQUE.

21. Subsequent to RTI's and UPONOR's distribution of the Swivel Nuts, UPONOR received notice from a builder/contractor, Palm Harbor, as well as individuals that certain of the Swivel Nuts were failing during and after installation in residences.

22. At various times, beginning in July 2002, RTI and UPONOR purchased from UNIQUE, pursuant to multiple purchase orders, ASTM Fl807 brass plumbing Fittings ("Fittings") with the intent and understanding that those Fittings would be further distributed by RTI and UPONOR to wholesalers for installation in residential plumbing systems.

23. UPONOR's purchases of Fittings from UNIQUE occurred at various times including, but not limited to, the fall of 2004 and were made, pursuant to multiple purchase orders. Sample copies of UPONOR Purchase Orders, relating to the Fittings, issued to UNIQUE

are attached hereto as Exhibit "A." These Fitting Purchase Orders were subject to UPONOR's standard Purchasing Terms and Conditions attached hereto as Exhibit "B."

24. During and after the discussions/negotiations relating to the sale of the Fittings UNIQUE understood that RTI and UPONOR would be acting as intermediate distributors of the Fittings and would be passing that product along to wholesalers and end users without any changes to the product.

25. During and after the discussions/negotiations relating to the sale of the Fittings, UNIQUE presented itself to RTI and UPONOR as knowledgeable regarding that product, represented that it was in the business of selling such products, and RTI and UPONOR relied on UNIQUE's experience and knowledge relating to the Fittings. Further, UNIQUE agreed to provide goods that were free from defects in workmanship, materials, and design, and which were merchantable and fit for their intended purpose of incorporation into residential plumbing systems.

26. Prior to the date on which RTI and UPONOR purchased the Fittings from UNIQUE, RTI and UPONOR entered into separate agreements with various entities to supply them with the Fittings, including wholesalers, plumbers as well as builders/contractors who installed them into residences throughout the United States. RTI and UPONOR made no changes or alterations to UNIQUE's Fittings and simply re-distributed UNIQUE's product in the same condition in which it was supplied by UNIQUE.

27. Pursuant to Paragraph 11 of the Terms and Conditions applicable to the Fitting Purchase Orders, UNIQUE agreed to indemnify UPONOR and "hold and save [UPONOR] from and against any and all claims, demands, liabilities, losses or expenses of whatsoever in kind and nature which [UPONOR] shall or may at any time sustain or incur by reason of, in consequence

of, or arising out of the manufacture, sale or delivery by [UNIQUE] of the goods and/or services described in this Purchase Order."

28. Pursuant to Paragraph 31 (Warranty Specifications) of the Terms and Conditions for the Fitting Purchase Orders, UNIQUE further "expressly warrant[ed that all goods and/or services, and workmanship with respect to the goods, covered by the Purchase Order or other description, drawings, specifications or samples furnished by [UNIQUE] will be in exact accordance with such Purchase Order, description, drawings, specifications or samples and free from defects in design (except to the extent such defective design is attributable to [UPONOR]), materials and workmanship and will be merchantable and fit for a particular purpose(s)."

29. Subsequent to UPONOR purchasing Swivel Nuts from UNIQUE, Palm Harbor and individuals informed UPONOR of multiple Swivel Nut failures, demanded reimbursement from UPONOR for the damages they claim to have sustained as a result of the defective Swivel Nuts and also demanded replacement of all UNIQUE Swivel Nuts contained in the approximately 5,000 Palm Harbor homes in which UNIQUE's Swivel Nuts had been installed.

30. Prior to August 24, 2006, UPONOR began receiving notices of failures of certain Fittings supplied by UNIQUE which had been incorporated into plumbing systems in various residential properties, which failures resulted in water damage.

31. On or about August 24, 2006 representatives of UPONOR met with representatives of UNIQUE to discuss the Swivel Nut and Fitting failures.

32. At the August 24, 2006 meeting UNIQUE agreed "that it will be responsible for any claims arising out of defective product." A copy of the August 28, 2006 e-mail from UNIQUE to UPONOR confirming that agreement is attached hereto as Exhibit "C".

33. At the August 24, 2006 meeting UNIQUE agreed that in exchange for UPONOR agreeing to "take the remaining inventory" UNIQUE "will take responsibility for these parts regarding quality and conformity to specifications." See Exhibit "C".

34. At the August 24, 2006 meeting UNIQUE agreed with respect to the Swivel Nuts, to pay for 50% of the then existing claims. It was also agreed at the August 24, 2006 meeting that an inquiry would be made of Palm Harbor related to the cost of pro-actively replacing all of the UNIQUE supplied Swivel Nuts. See Exhibit "C".

35. In an e-mail dated September 15, 2006, from UNIQUE to UPONOR, UNIQUE stated that "[a]s agreed during our meeting you will take our inventory and in return we will take care of the existing claims plus stand behind any future claims." A copy of the September 15, 2006 e-mail is attached hereto as Exhibit "D".

36. In the September 15, 2006 e-mail, UNIQUE stated that "our product meets all the requirements of F1807 except the lead which is a little lower. It is for this that we are standing behind our product in case there are any claims etc.". See Exhibit "D".

37. In an e-mail of September 11, 2006, regarding the current inventory of product in stock in Houston, currently "on water" and ready for shipment from "overseas", UNIQUE stated that " .. should there be any non-conforming product, UNIQUE will issue an immediate credit to UPONOR". See the e-mail of Hetal Bhavsar of September 11, 2006 attached hereto as Exhibit "E".

38. On or about October 4, 2006 UPONOR released Purchase Order #825548 covering UNIQUE inventory. UNIQUE agreed to the terms of the offer relating to Purchase Order #825548. See Purchase Order #825548 attached hereto as Exhibit "F" and the e-mail from UNIQUE (Jay Milani) dated October 9, 2006 attached hereto as Exhibit "G".

39. In the e-mail of October 9, 2006 Mr. Milani states that UNIQUE will "… cooperate fully and take care of claims and put this issue behind us." See Exhibit "G".

40. Purchase Order #825548 provides that acceptance of the product listed on the Purchase Order "is subject to the attached UPONOR, Inc. terms and conditions and the product meeting UPONOR's quality testing, F1807 standards and all applicable represented standards." See Exhibit "F". See Exhibit "B" for the terms and conditions referred to in Exhibit "F".

41. Pursuant to Paragraph 11 of the Terms and Conditions applicable to the UPONOR Purchase Order UNIQUE agreed to indemnify UPONOR and "hold and save [UPONOR] from and against any and all claims, demands, liabilities, losses or expenses of whatsoever in kind and nature which [UPONOR] shall or may at any time sustain or incur by reason of, in consequence of, or arising out of the manufacture, sale or delivery by [UNIQUE] of the goods and/or services described in this Purchase Order."

42. Pursuant to Paragraph 31 (Warranty Specifications) of the Terms and Conditions UNIQUE further "expressly warranted that all goods and/or services, and workmanship with respect to the goods, covered by the Purchase Order or other description, drawings, specifications or samples furnished by [UNIQUE] will be in exact accordance with such Purchase Order, description, drawings, specifications or samples and free from defects in design (except to the extent such defective design is attributable to [UPONOR]), materials and workmanship and will be merchantable and fit for a particular purpose(s)."

43. In August of 2006, UPONOR was in contact with various individuals and entities regarding the failures of the Fittings and Swivel Nuts that UNIQUE sold to UPONOR and, as a result of the failures, the Fittings and Swivel Nuts were removed from the inventory of those individuals and entities and returned to UPONOR.

44. UNIQUE's Fittings were supplied through a distribution chain to end users, including a builder named Ryan Homes, a subsidiary of NVR, Inc. Ryan Homes had discovered that UNIQUE's Fittings installed in residences constructed by it were failing, and made a demand that the Fittings be replaced.

45 Ryan Homes has claimed that it incurred damages resulting from Fitting failures. These damages related to the costs and expenses associated with the removal and replacement of the Fittings installed in select residences in Virginia.

46. On or about November 29, 2006 UPONOR, both orally and in writing, put UNIQUE on notice of claims that had been made by Ryan Homes regarding the replacement of ASTM F1807 Fittings supplied by UNIQUE and the demand by Palm Harbor Homes for replacement of Swivel Nuts supplied by UNIQUE. A copy of the November 29, 2006 e-mail of Sheila King of UPONOR to Hetal Bhavsar of UNIQUE is attached hereto as Exhibit "H". UNIQUE has refused to pay for the replacement of the Fittings and Swivel Nuts.

47. UPONOR has paid the damages claimed by Ryan Homes and has presented a claim to UNIQUE pursuant to the agreement UNIQUE made with UPONOR for reimbursement of the sums that UPONOR paid as a result of the failure of UNIQUE's Fittings. UNIQUE has failed to make reimbursement to UPONOR for these sums.

48. UPONOR has tendered all known manufacturing defect related claims for Fittings and Swivel Nuts to UNIQUE relative to costs that it has incurred thus far and/or will incur as a result of the defective Fittings and Swivel Nuts that UNIQUE sold to RTI and UPONOR.

49. Palm Harbor has also made demand upon UPONOR for all costs and expenses associated with the removal and replacement of Swivel Nuts installed in its homes throughout

the United States. UPONOR, in turn, presented a claim to UNIQUE for the sums being sought by Palm Harbor. UNIQUE has failed to honor and pay UPONOR's claim.

50. To date, UPONOR has paid in excess of $75,000 in connection with claims by Palm Harbor relating to Swivel Nuts, over $75,000 to Ryan Homes/NVR in connection with its claims for defective Fittings and over $75,000 to third parties for payment of swivel nut and fitting claims despite the fact that UPONOR is an innocent seller which did not manufacture the Fittings and Swivel Nuts and made no alterations or modifications to the products supplied by UNIQUE.

51. Since mid-2006, UPONOR has sought, with no success, reimbursement and/or tendered claims to UNIQUE relative to Fitting and Swivel Nut failures.

52. UNIQUE has failed to accept claims and/or reimburse UPONOR for payments made relative to Fittings and Swivel Nut failures.

53. At present, UPONOR has sustained damages in the form of honoring warranty claims, related costs and expenses incurred as a result of defects and deficiencies in UNIQUE products, as well as the complained of acts and/or omissions of UNIQUE. In addition, UPONOR may lose future business and profits from various entities as a result of the deficiencies in the Fittings and Swivel Nuts supplied by UNIQUE.

**COUNT I**

**(*Breach of Contract*)**

54. UPONOR re-alleges and incorporates Paragraphs 1 through 53 of the Amended Complaint as though fully set forth herein. Pursuant to the language of the written e-mails

referenced herein and exchanged between UNIQUE and UPONOR, UNIQUE agreed to take responsibility for all claims, present and future relating to products it had sold UPONOR.

55. Pursuant to the Standard Terms and Conditions governing the purchase orders, UNIQUE agreed to indemnify UPONOR in connection with any claims or demands arising out of the products supplied to UPONOR by UNIQUE.

56. In exchange for UNIQUE's promise to stand behind claims made relating to its products, UPONOR agreed to take all of the UNIQUE inventory identified on Purchase Order 825548 that met the criteria specified/referenced on the Purchase Order. UNIQUE agreed to these terms.

57. Pursuant to the communications between UNIQUE and RTI in July and August 2002, UNIQUE agreed to supply Fittings that complied with ASTM F1807 standards.

58. Pursuant to the language of the purchase orders exchanged between UPONOR and UNIQUE including, but not limited to, Purchase Order #825548 and the terms and conditions incorporated therein, UNIQUE agreed to supply and/or manufacture products which were fit for their intended purpose, merchantable and reasonable for consumer installations.

59. As domestic agent for a foreign manufacturer of the products at issue, and as a distributor of the products involved in this matter, UNIQUE held itself out as being knowledgeable, skilled and competent in the business of manufacturing and supplying Fittings and Swivel Nuts and represented that the Fittings and Swivel Nuts would he manufactured in a good and workmanlike manner, and fit for their intended purpose.

60. Pursuant to the Standard Terms and Conditions governing the purchase orders exchanged between UPONOR and UNIQUE including, but not limited to, Purchase Order #825548, as well as UNIQUE's e-mails to UPONOR, UNIQUE agreed to indemnify UPONOR

in connection with any claims or demands arising out of the products supplied to UPONOR or RTI by UNIQUE.

61. UNIQUE breached its agreement with UPONOR in one or more of the following respects because UNIQUE:

a) defectively manufactured the subject Fittings and Swivel Nuts;

b) failed to take reasonable steps to ensure that the Fittings would not be subject or prone to fracturing post-manufacture in expected and intended residential use;

c) failed to take reasonable steps to ensure that the Swivel Nuts would not be subject or prone to fracturing post-manufacture in expected and intended residential use;

d) failed to properly test, inspect and evaluate the Fittings and Swivel Nuts prior to distributing those products to determine that they were suitable and fit for installation in residential plumbing systems;

e) supplied RTI and UPONOR with Swivel Nuts and Fittings that were not merchantable, or suited for their reasonable, expected and intended use in residential plumbing systems, and which were not free from defects in materials, design and workmanship;

f) failed, despite repeated demands by UPONOR, to indemnify UPONOR for the costs and expenses incurred in connection with failures of products supplied by UNIQUE to UPONOR, which products have been injected into the stream of commerce by UNIQUE;

g) failed to supply Fittings that complied with ASTM standard F1807 and the chemical composition requirements specified in attachments thereto;

h) failed to abide by its agreement to "stand behind" and pay for present and future claims relating to products it sold; and

i) otherwise breached its Agreements with RTI and UPONOR.

62. At all times relevant, UPONOR fulfilled all obligations and/or responsibilities that it had and which arose out of the agreements with UNIQUE for the products at issue.

63. As a direct and proximate result of the aforementioned breaches of the Agreements by UNIQUE, UPONOR has sustained damages within the jurisdictional limits of this Court.

**COUNT II**

***(Breach of Express Warranty of Merchantability)***

64. UPONOR re-alleges and incorporates Paragraphs 1 through 53 of the Amended Complaint as though fully set forth herein. Pursuant to UNIQUE's agreement to produce and supply Fittings that complied with ASTM F1807 standards, UNIQUE's agreement to manufacture and supply Swivel Nuts that conform to industry standards, and under the Terms and Conditions governing the Fitting and Swivel Nuts under UPONOR purchase orders, UNIQUE warranted that the design and the manufacture of the subject Fittings and Swivel Nuts was in accordance with recognized and sound engineering principles, as well as industry standards and that those products were in a good and merchantable condition such that the Fittings and Swivel Nuts were reasonably fit for the ordinary purposes for which they were intended to be used.

65. The subject Fittings supplied by UNIQUE were not in a good and merchantable condition upon receipt by UPONOR since they were susceptible to failure due to fracturing from various causes including poor microstructure, pre-existing cracks and deficient chemical composition.

66. The subject Swivel Nuts supplied by UNIQUE were not in a good and merchantable condition upon receipt by UPONOR since they had excessive porosity in the walls of the nuts and the threads were not properly manufactured.

67. As a direct and proximate result of the aforementioned breach of express warranty by UNIQUE, UPONOR sustained damages.

**COUNT III**

***(Breach of Implied Warranty of Merchantability)***

68. UPONOR re-alleges and incorporates Paragraphs 1 through 53 of the Amended Complaint as though fully set forth herein. At all times relevant, and in accordance with the provisions of Section 2.314(a) of the Texas Business and Commerce Code UNIQUE, as the apparent manufacturer of the goods/products at issue, and being a merchant/seller with respect to those products/goods, impliedly warranted that the design and manufacture of the subject Fittings and Swivel Nuts was done in a fashion that left those products in a good and merchantable condition so that the Fittings and Swivel Nuts were reasonably fit for the ordinary purposes for which they were intended and would pass without objection in the trade.

69. The subject Fittings and Swivel Nuts supplied by UNIQUE were not in a good and merchantable condition when they were supplied to UPONOR, were not fit for the ordinary purposes for which such goods are used, and would not pass without objection in the trade as evidenced by multiple failures of the goods when put to their ordinary and intended uses.

70. UPONOR duly and reasonably relied on the skill and judgment of UNIQUE as the apparent manufacturer of the goods, as a merchant/seller of the goods and as a marketer of the goods, in connection with the design, manufacture and supply of the Fittings and Swivel Nuts which were to be merchantable when supplied to UPONOR.

71. As a direct and proximate result of the aforementioned breach of implied warranty by UNIQUE, UPONOR has sustained damages.

**COUNT IV**

***(Breach of Implied Warranty of Fitness for a Particular Purpose)***

72. UPONOR re-alleges and incorporates Paragraphs 1 through 53 of the Amended Complaint as though fully set forth herein. At all times relevant, and in accordance with the relevant provisions of Section 2.315 of the Texas Business and Commercial Code, UNIQUE was a seller/merchant with respect to the goods at issue, had reason to know of the particular purpose for which the goods were needed, and had reason to know that UPONOR was relying on UNIQUE's skill or judgment to select or furnish suitable goods, thereby giving an implied warranty that the subject Fittings and Swivel Nuts were fit for their particular purpose and/or use and that the Fittings and Swivel Nuts were suitable to be incorporation into residential plumbing systems under expected and anticipated conditions.

73. Notwithstanding the foregoing warranty, the Fittings supplied by UNIQUE were not fit for their particular purpose or use as they experienced multiple failures for various reasons including, but not limited to, their poor microstructure and pre-existing cracks.

74. The Swivel Nuts supplied by UNIQUE were not fit for the particular purpose or use for various reasons including, but not limited to, excessive porosity and defective machining of their threads.

75. UPONOR and prior to it RTI, duly and reasonably relied on the skill and judgment of UNIQUE, as the apparent manufacturer, seller and marketer of the goods, to supply Fittings and Swivel Nuts which were fit for their intended and particular purpose and use.

76. As a direct and proximate result of the unfit condition of the subject Fittings and Swivel Nuts, multiple failures of those products occurred, causing damage to UPONOR.

## COUNT V

***(Common Law Indemnity)***

77. UPONOR realleges and incorporates Paragraphs 1 through 53 of the Amended Complaint as though fully set forth herein. UNIQUE was the apparent manufacturer of the Fittings and Swivel Nuts involved in this matter and so held itself out to companies in the market for such products, including RTI and UPONOR.

78. On information and belief, UNIQUE was the importer, distributor and marketer of the Fittings and Swivel Nuts involved in this matter, and UNIQUE was the entity that placed the Fittings and Swivel Nuts into the stream of commerce causing UPONOR to sustain damages when those products failed.

79. Neither RTI nor UPONOR made any changes or alterations to the Fittings and Swivel Nuts at issue in this matter, and was an innocent retailer in the chain of distribution of the Fittings and Swivel Nuts.

80. As a result of multiple failures of the Fittings and Swivel Nuts, claims for damages have been made and directed to UPONOR as a "down stream" participant in the chain of distribution of the goods at issue. Notwithstanding its role as an innocent retailer in the chain of distribution, UPONOR has incurred expenses in connection with such claims including, but not limited to, payment of property damage claims due to the failure of the UNIQUE products.

81. UPONOR has made demand upon UNIQUE for reimbursement of sums spent in connection with these claims and UNIQUE has failed to honor UPONOR's demand.

82. As a result of their relative positions in connection with the manufacture, sale and distribution of the products at issue, UPONOR is entitled to be indemnified by UNIQUE for

damages it has incurred as a result of the failures of Fittings and Swivel Nuts placed into the stream of commerce by UNIQUE.

**COUNT VI**

***(Breach of Express Indemnity)***

83. UPONOR re-alleges and incorporates Paragraphs 1 through 53 of the Amended Complaint as though fully set forth herein. Under the terms of the e-mails exchanged between UNIQUE and UPONOR, UNIQUE agreed to pay for claims relating to failures of Swivel Nuts and Fittings. Furthermore, pursuant to the terms and conditions which form a part of and govern the Purchase Orders exchanged by UPONOR and UNIQUE, UNIQUE agreed to indemnify UPONOR for any and all claims, liabilities, losses or expenses arising out of the sale of the Fittings and Swivel Nuts.

84. UPONOR sold the Fittings and Swivel Nuts to various entities, and as a result of the failure of those products, UPONOR has received claims, and has incurred liabilities, losses, costs and expenses.

85 Pursuant to the indemnity obligations referred to above, UPONOR tendered all claims, liabilities, losses, costs and expenses to UNIQUE.

86. To date, UNIQUE has failed and refused to reimburse UPONOR, resulting in UPONOR sustaining damages.

**COUNT VII**

***(Strict Products Liability — Defective Product)***

87. UPONOR re-alleges and incorporates Paragraphs 1 through 53 of the Amended Complaint as though fully set forth herein. At all times relevant, UNIQUE was engaged in the

business of selling, marketing, and distributing the Fittings and Swivel Nuts involved in this matter, and it was expected that the Fittings and Swivel Nuts would reach the ultimate user or consumer without substantial change in the condition in which those products were sold. The Fittings and Swivel Nuts sold, marketed and distributed by UNIQUE did reach the ultimate user or consumer in the condition in which those products were sold by UNIQUE.

88. The Fittings and Swivel Nuts involved in this matter were defective and unreasonably dangerous at the time they were sold by UNIQUE as the construction and quality of the Fittings and Swivel Nuts deviated from the specifications and/or planned output of those products in various ways including, but not limited to, failing to comply with ASTM F1807 standards including chemical composition, poor micro- structure and preexisting cracks in the Fittings and preexisting cracks, excessive porosity and deficiencies in the machining of the threads in the Swivel Nuts, rendering both types of products unreasonably dangerous. These defects existed at the time the Fittings and Swivel Nuts left the possession of UNIQUE and caused UPONOR to sustain damages as a result of the failures of the Fittings and Swivel Nuts.

89. As a direct and proximate result of the defective and unreasonably dangerous condition of the Fittings and Swivel Nuts, those products failed, causing water damage to residences following the installation of those products as part of the residential plumbing systems, and requiring the removal of those products due to a heightened failure potential.

90. As a direct and proximate result of the defective and unreasonably dangerous condition of the Fittings and Swivel Nuts, multiple failures of those products occurred, causing UPONOR to sustain damages, and UPONOR is likely to continue to sustain damages in the future.

## COUNT VIII

***(Negligence)***

91. UPONOR re-alleges and incorporates Paragraphs 1 through 53 of the Amended Complaint as though fully set forth herein. UNIQUE, as the apparent manufacturer, seller, distributor and marketer of the products involved in this matter owed a duty to UPONOR to provide it with products that were merchantable, fit for their intended and foreseeable purposes/uses and which were manufactured in accordance with reasonable and recognized industry standards.

92. On information and belief, on and prior to August 24, 2006, UNIQUE knew of problems with the type of pex Fittings supplied by it to RTI and UPONOR and prior to that date had changed the style of pex Fittings supplied to competitors of UPONOR, but failed to notify UPONOR or make a similar change relating to product being supplied to UPONOR.

93. UNIQUE breached its duty to UPONOR in connection with the Fittings and Swivel Nuts it sold to UPONOR in one or more of the following ways:

a) defectively manufactured the subject Fittings and Swivel Nuts in various ways including, but not limited to, creating the presence of poor microstructure and cracks, excessive porosity and deficient thread structured patterns;

b) distributed/sold Fittings and Swivel Nuts which were cracked, structurally unsound, not fit for ordinary use in residential plumbing system, and which were not fit for their intended purposes;

c) failed to take reasonable steps to ensure that the Fittings would not be subject or prone to fracturing post manufacture in expected and intended residential use;

d) failed to take reasonable steps to ensure that the Swivel Nuts would not be subject or prone to fracturing post manufacture in expected and intended residential use;

e) failed to properly test, inspect and evaluate the Fittings and Swivel Nuts prior to distributing those products to determine that they were suitable and fit for installation in residential plumbing systems.

f) continued to distribute/sell Swivel Nuts and Fittings that were not suitable for their reasonable, expected and intended use in residential plumbing systems after it knew or in the exercise of reasonable care should have know of the deficiencies or defects in those products;

g) failed to monitor the manufacturing process to ensure that there was not excessive porosity in the walls of the Swivel Nuts;

h) failed to monitor the production of the Fittings to ensure that the proper chemical composition was present and that the machining and washing process was correctly done;

i) failed to advise UPONOR that it had made changes to the manufacturing and/or design of the Fittings sold to certain of UPONOR's competitors at the same time UNIQUE continued to sell those Fittings to UPONOR; and

j) otherwise acted in a careless and negligent fashion in connection with the distribution and sale of the Fittings and Swivel Nuts.

94. As a direct and proximate result of the negligent acts and omissions of UNIQUE with respect to the Fittings and Swivel Nuts, those products failed, causing water damage to residences following the installation of those products as part of residential plumbing systems, and also caused UPONOR damage by making it necessary to pro-actively replace Fittings and Swivel Nuts.

95. As a direct and proximate result of the negligent acts and omissions of UNIQUE, which have caused or contributed to the multiple failures of the products involved in this matter, UPONOR has sustained damages and is likely to continue to sustain damages in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff UPONOR, INC. respectfully requests that Defendant be cited to appear and that this Court enter judgment for Plaintiff and against Defendant UNIQUE INDUSTRIAL PRODUCT COMPANY in an amount to be determined by the trier of fact, together with interest, costs, and attorney's fees. Plaintiff also respectfully requests any other and further relief as the Court deems just and equitable to which Plaintiff may be entitled.

Respectfully submitted,

SHANNON, GRACEY, RATLIFF & MILLER, L.L.P.

By: *Howard L. Fieber*

Joseph R. Little
State Bar No. 00784483
Southern District of Texas Bar No. 15972
1301 McKinney Street, Suite 2920
Houston, Texas 77010
(713) 255-4700 - Telephone
(713) 655-1597 – Facsimile

Attorney in Charge for Plaintiff
Fisher Kanaris, P.C.
200 S. Wacker Drive
Floor
Chicago, Illinois 60606
(312) 474-1400 - Telephone
(312) 474-1410 – Facsimile

Of Counsel for Plaintiff

**uponor**

5925 148th Street West
Apple Valley, MN 55124
Tel: (952)891-2000
Fax: (952)891-5390

Ship To: 2300 West Highway 13
Suite 400
Burnsville,MN 55337
United States

Bill To: 5925 148th Street West
Apple Valley,MN 55124
United States

Vendor: UNIQUE INDUSTRIAL PRODUCT COMPAN
12600 CARDINAL MEADOW
SUGAR LAND,TX 77478
United States

**Purchase Order**

| Order Number | Revision | Page |
|---|---|---|
| 815488 | 8 | 3 |

This purchase order must appear on all invoices, packing lists,cartons, and correspondence related to this order.

| | |
|---|---|
| Date of Order: 11-NOV-04 | Buyer: C Sellner |
| Date of Revision: 18-MAR-05 | Buyer: P Milford |

| Customer No. | Vendor No. | Payment Terms | Freight Terms | F.O.B. | Ship Via |
|---|---|---|---|---|---|
| | 102647 | NET60 | | | |

Confirm To / Telephone: PRADEEP GUPTA
Fax No.: (831) 665-5632
Request or Deliver To:

| Line | Part Number / Description | Rev | Delivery Date | Quantity | Unit | Unit Price | Extension | Tax |
|---|---|---|---|---|---|---|---|---|
| 17 | P4707575 SSC Brass Tee, 3/4" PEX x 3/4" PEX x 3/4" PEX | AA | 03-DEC-04 | 0.0 | EACH | .455 | 0.00 | N |
| 18 | P4701010 SSC Brass Tee, 1" PEX x 1" PEX x 1" PEX | AA | 03-DEC-04 | 0.0 | EACH | .939 | 0.00 | N |
| 19 | P4705575 SSC Brass Reducing Tee, 1/2" PEX x 1/2" PEX x 3/4" PEX | AA | 03-DEC-04 | 0.0 | EACH | .475 | 0.00 | N |
| 20 | P4707555 SSC Brass Reducing Tee, 3/4" PEX x 1/2" PEX x 1/2" PEX | AA | 03-DEC-04 | 0.0 | EACH | .475 | 0.00 | N |
| 21 | P4707557 SSC Brass Reducing Tee, 3/4" PEX x 1/2" PEX x 3/4" PEX | AA | 03-DEC-04 | 0.0 | EACH | .475 | 0.00 | N |
| 22 | P4707550 SSC Brass Reducing Tee, 3/4" PEX x 3/4" PEX x 1/2" PEX | AA | 03-DEC-04 | 0.0 | EACH | .475 | 0.00 | N |
| 23 | P4701775 SSC Brass Reducing Tee, 1" PEX x 3/4" PEX x 3/4" PEX | AA | 03-DEC-04 | 0.0 | EACH | .923 | 0.00 | N |
| 24 | P4701150 SSC Brass Reducing Tee, 1" PEX x 1" PEX x 1/2" PEX | AA | 03-DEC-04 | 0.0 | EACH | .928 | 0.00 | N |
| 25 | P4701175 SSC Brass Reducing Tee, 1" PEX x 1" PEX x 3/4" PEX | AA | 03-DEC-04 | 0.0 | EACH | .928 | 0.00 | N |

These components fully comply with the requirements of the component drawing

EXHIBIT
A

Total: Continued

Chris Sellner

Authorized Signature

**uponor**

5925 148th Street West
Apple Valley, MN 55124
Tel: (952)891-2000
Fax: (952)891-5390

Ship To: 2300 West Highway 13
Suite 400
Burnsville,MN 55337
United States

Bill To: 5925 148th Street West
Apple Valley,MN 55124
United States

Vendor: UNIQUE INDUSTRIAL PRODUCT COMPAN
12600 CARDINAL MEADOW
SUGAR LAND,TX 77478
United States

**Purchase Order**

| Order Number | Revision | Page |
|---|---|---|
| 815488 | 8 | 4 |

This purchase order must appear on all invoices, packing lists,cartons, and correspondence related to this order.

| Date of Order | Buyer |
|---|---|
| 11-NOV-04 | C Sellner |
| **Date of Revision** | **Buyer** |
| 18-MAR-05 | P Milford |

| Customer No. | Vendor No. | Payment Terms | Freight Terms | F.O.B. | Ship Via |
|---|---|---|---|---|---|
| | 102647 | NET60 | | | |

| Confirm To / Telephone | Fax No. | Request or Deliver To: |
|---|---|---|
| PRADEEP GUPTA | (831) 665-5632 | |

| Line | Part Number / Description | Rev | Delivery Date | Quantity | Unit | Unit Price | Extension | Tax |
|---|---|---|---|---|---|---|---|---|
| 26 | P4545050<br>SSC Brass Coupling, 1/2" PEX x 1/2" PEX | -AA | 03-DEC-04 | 0.0 | EACH | .128 | 0.00 | N |
| 27 | P4547575<br>SSC Brass Coupling, 3/4" PEX x 3/4" PEX | -AA | 03-DEC-04 | 0.0 | EACH | .194 | 0.00 | N |
| 28 | P4541010<br>SSC Brass Coupling, 1" PEX x 1" PEX | -AA | 03-DEC-04 | 0.0 | EACH | .406 | 0.00 | N |
| 29 | P4545075<br>SSC Brass Coupling, 1/2" PEX x 3/4" PEX | -AA | 03-DEC-04 | 0.0 | EACH | .195 | 0.00 | N |
| 30 | P4547510<br>SSC Brass Coupling, 3/4" PEX x 1" PEX | -AA | 03-DEC-04 | 0.0 | EACH | .411 | 0.00 | N |
| 31 | P4585050<br>SSC to PB Coupling, 1/2" PEX x 1/2" PB | -AA | 03-DEC-04 | 0.0 | EACH | .196 | 0.00 | N |
| 32 | P4587575<br>SSC to PB Coupling, 3/4" PEX x 3/4" PB | -AA | 03-DEC-04 | 0.0 | EACH | .257 | 0.00 | N |
| 33 | P4710500<br>SSC Brass Elbow, 1/2" PEX X 1/2" PEX | -AA | 03-DEC-04 | 0.0 | EACH | .265 | 0.00 | N |
| 34 | P4715075<br>SSC Brass Elbow, 1/2" PEX x 3/4" PEX | -AA | 03-DEC-04 | 0.0 | EACH | .375 | 0.00 | N |

These components fully comply with the requirements of the component drawing

**Total:** Continued

Chris Sellner

Authorized Signature

**uponor**

5925 148th Street West
Apple Valley, MN 55124
Tel: (952)891-2000
Fax: (952)891-5390

Vendor: UNIQUE INDUSTRIAL PRODUCT COMPAN
12600 CARDINAL MEADOW
SUGAR LAND, TX 77478
United States

Ship To: 2300 West Highway 13
Suite 400
Burnsville, MN 55337
United States

Bill To: 5925 148th Street West
Apple Valley, MN 55124
United States

**Purchase Order**

| Order Number | Revision | Page |
|---|---|---|
| 815488 | 8 | 5 |

This purchase order must appear on all invoices, packing lists, cartons, and correspondence related to this order.

| Date of Order | Buyer |
|---|---|
| 11-NOV-04 | C Sellner |
| Date of Revision | Buyer |
| 18-MAR-05 | P Milford |

| Customer No. | Vendor No. | Payment Terms | Freight Terms | F.O.B. | Ship Via |
|---|---|---|---|---|---|
| | 102647 | NET60 | | | |

Confirm To / Telephone: PRADEEP GUPTA
Fax No.: (831) 665-5632
Request or Deliver To:

| Line | Part Number / Description | Rev | Delivery Date | Quantity | Unit | Unit Price | Extension | Tax |
|---|---|---|---|---|---|---|---|---|
| 35 | P4710750<br>SSC Brass Elbow, 3/4" PEX x 3/4" PEX | -AA | 03-DEC-04 | -1500.0 | EACH | .365 | (547.50) | N |
| 36 | P4711000<br>SSC Brass Elbow, 1" PEX x 1" PEX | -AA | 03-DEC-04 | 0.0 | EACH | .791 | 0.00 | N |
| 37 | P4235050<br>SSC Drop Ear Elbow, 1/2" PEX 1/2" NPT | -AA | 03-DEC-04 | 0.0 | EACH | .873 | 0.00 | N |
| 38 | P4237575<br>SSC Drop Ear Elbow, 3/4" PEX x 3/4" NPT | -AA | 03-DEC-04 | 0.0 | EACH | .95 | 0.00 | N |
| 39 | P2197550<br>3/4" Brass Manifold with 4-1/2" PEX Outlets | -AA | 03-DEC-04 | 0.0 | EACH | 2.25 | 0.00 | N |
| 40 | P2187557<br>34/" Brass Flow-through Manifold with 3 - 1/2" PEX outlets | -AA | 03-DEC-04 | 0.0 | EACH | 2.25 | 0.00 | N |
| 41 | P2187550<br>3/4" Brass Manifold with 3-1/2" PEX Outlets | -AA | 03-DEC-04 | 0.0 | EACH | 2.15 | 0.00 | N |
| 42 | P2197557<br>3/4" Brass Flow-through Manifold with 4 - 1/2" PEX Outlets<br>MANIFOLDS ARE PKG'D<br>10/BAG 100/MASTER BOX | -AA | 03-DEC-04 | 0.0 | EACH | 2.54 | 0.00 | N |

These components fully comply with the requirements of the component drawing

Total: Continued

Chris Sellner

Authorized Signature

**uponor**

5925 148th Street West
Apple Valley, MN 55124
Tel: (952)891-2000
Fax: (952)891-5390

Vendor: UNIQUE INDUSTRIAL PRODUCT COMPAN
12600 CARDINAL MEADOW
SUGAR LAND,TX 77478
United States

Ship To: 2300 West Highway 13
Suite 400
Burnsville,MN 55337
United States

Bill To: 5925 148th Street West
Apple Valley,MN 55124
United States

**Purchase Order**

| Order Number | Revision | Page |
|---|---|---|
| 824494 | 1 | 1 |

This purchase order must appear on all invoices, packing lists,cartons, and correspondence related to this order.

| Date of Order | Buyer |
|---|---|
| 12-JUL-06 | P Milford |
| **Date of Revision** | **Buyer** |
| 18-JUL-06 | P Milford |

| Customer No. | Vendor No. | Payment Terms | Freight Terms | F.O.B. | Ship Via |
|---|---|---|---|---|---|
| | 102647 | NET60 | | | |

| Confirm To / Telephone | Fax No. | Request or Deliver To: |
|---|---|---|
| | (831) 665-5632 | Lenway, Jim D |

| Line | Part Number / Description | Rev | Delivery Date | Quantity | Unit | Unit Price | Extension | Tax |
|---|---|---|---|---|---|---|---|---|
| 1 | P4705050<br>SSC Brass Tee, 1/2" PEX x 1/2" PEX x 1/2" PEX | -AA | 21-JUL-06 | 0.0 | EACH | .498 | 0.00 | N |

These components fully comply with the requirements of the component drawing

**Total:** 0.00

[signature]

Authorized Signature

uponor

# Uponor, Inc. Purchasing Terms and Conditions

1) ACCEPTANCE. Acceptance of this Purchase Order may be made by any medium and in any manner reasonable under the circumstances. Without limiting the generality of the foregoing, Seller's return to Buyer of either a copy hereof or written acknowledgement of Seller's acceptance hereof or Seller's commencement of any performance called for hereby or preparation for such performance shall be deemed to constitute such acceptance. This Purchase Order shall not be construed as an acceptance of any previous offer that may have been made by Seller and with respect to any such previous offer, if any, this Purchase Order shall operate as a rejection and counter offer. Buyer hereby objects to the inclusion of any different or additional terms proposed by Seller in its written acceptance. Seller agrees that a contract of sale will result upon the terms stated herein, unless Buyer has agreed in writing to accept such different or additional terms prior to Seller's returning its written acceptance to Buyer or beginning performance under the Purchaser Order. No oral agreement or other understanding shall in any way modify this Purchase Order or the terms or the conditions hereof.

2) ADVERTISING. Without first obtaining Buyer's written consent, Seller shall not in any manner advertise or disclose the fact that Seller has furnished or contracted to furnish Buyer with the goods and/or services herein specified or disclose any of the details connected with this Purchase Order to any third party except as may be required to perform under this Purchase Order.

3) GOVERNING LAW; VENUE. This Agreement will be governed, construed and interpreted in accordance with the laws of the State of Minnesota without giving effect to any choice of law provisions. The parties hereby agree that all actions or proceedings arising out of this Agreement will be litigated in the state or federal courts located in Hennepin County, Minnesota. The parties expressly agree and consent to venue in and the exclusive jurisdiction of such courts and consent to service of process in any such action or proceeding by personal delivery or any other method permitted by law. The parties further agree and confirm that the United Nations Convention for the International Sale of Goods, 1980 shall not apply to the transaction(s) set forth in this Purchase Order.

4) CHANGES. Buyer may at any time by written change order, suspend performance in whole or in part, make changes in drawings, designs, specifications, method of shipment or packing, or time or place of delivery, require additional work or direct the omission of work. If any such change order causes an increase or decrease in the cost of or the time requested for the performance of this Purchase Order, an equitable adjustment shall be made in the contract price or delivery date or schedule, or both and this Purchase Order shall be modified in writing accordingly. Any claim for adjustment under this paragraph shall conclusively be deemed waived unless asserted in writing within thirty (30) days from the date of receipt by the Seller of the change order. The amount of the claim shall be stated when it is submitted. Any change order will not be binding on Buyer unless issued by an authorized purchasing agent of Buyer. Nothing in this paragraph shall excuse Seller from proceeding with the purchase order as changed. Seller may not change or otherwise deviate from this Purchase Order or the specifications furnished hereunder. Further, upon approval by the Buyer of the initial design, any process changes, design changes or deviations considered by the Seller must be submitted to Buyer in writing for review. If changes are submitted for approval the information submitted shall include a complete description of the change and the affect the change will have on all characteristics of the device upon request, the Seller shall submit samples of the proposed good for the evaluation and approval by Buyer. Unless Buyer has expressly so agreed in writing, the Seller shall not make any such change or deviation.

5) COMPLIANCE WITH LAWS. The Seller represents and warrants that the goods and/or services covered by the Purchase Order: (a) were not manufactured and are not being sold or priced in violation of any applicable federal, state, provincial or local law or regulation, executive order or administrative ruling; and (b) are or have been certified or tested to be compliant with applicable industry standards or other applicable specifications or standards. Without limiting the generality of the foregoing, Seller represents to Buyer that such goods and their sale or purchase hereunder are not:

a) In violation of Sections 5 or 12 of the Federal Trade Commission Act nor Sections 1 or 3 of the Robinson-Patman Act

b) In violation of any of the provisions of the Fair Packaging and Labeling Act, or

c) In violation of the Federal Food, Drug and Cosmetic Act as amended or any comparable state or municipal law

d) In violation of the Civil Rights Act of 1964 as amended and all regulations promulgated there under including Executive Order 11246

e) In violation of the Fair Labor Standards Act as amended and all applicable regulations promulgated there under and Seller represents and warrants that it is in compliance with the provisions of Executive Order 11246, Part II, Sec. 202, paragraphs (1) through (7) and Executive Order 11375, which provisions are incorporated herein by reference.

Seller further covenants to save and hold Buyer harmless of and from, and to reimburse Buyer for any and all costs, damages, and expenses including attorneys fees incurred or resulting directly or indirectly by or to Buyer as a direct or indirect result of the breach of any representation or warranty made in this Section of the Purchase Order.

6) DELIVERY. Time is of the essence in the performance of this Purchase Order. Buyer may accept or return to Seller at Seller's expense items received in advance of their required delivery date as specified on the face of this Purchase Order. No such retention shall waive Buyer's right to return any subsequent shipments delivered in advance of the required delivery date, nor shall such retention accelerate time for payment. Overshipments may be returned at Seller's expense or retained by Buyer at no increase in price. Seller shall not, without Buyer's written consent, manufacture or procure materials in advance of Seller's normal flow time or deliver in advance of schedule. In the event of termination or change, no claims will be allowed for any such manufacture or procurement in advance of such normal flow time unless there has been such prior written consent of Buyer. Buyer further reserves the right to cancel this Purchase Order in accordance with the Termination Section below and to charge the Seller with any damages incurred as a result of the Seller's failure to make delivery within the time specified in the Purchase Order. In the absence of specific delivery terms for goods set forth in this Purchase Order, all goods shall be deemed to be delivered CIF Buyers ordering facility dock.

7) DRAWINGS, PATTERNS, ETC. All drawings, blueprints, tracings, materials, molds, tooling and other items prepared by the Seller in filling this Purchase Order, as well as any such items furnished hereunder to the Seller by the Buyer, shall be the property of the Buyer, and such items shall be delivered to the Buyer upon the completion or termination of this Purchase Order. No reproductions thereof shall be retained except as authorized in writing by the Buyer. Such items shall not be used or disclosed to third parties by the Seller or anyone under its control without the prior written consent of the Buyer.

8) ENTIRE AGREEMENT AND SUCCESSORS AND ASSIGNS. This Purchase Order contains all of the items and conditions agreed upon and constitutes the entire agreement between the parties, and shall be binding upon their representatives, successors and assigns, if any.

9) EXTRA CHARGES. No additional charges of any kind, including charges for boxing, packing, cartage or other extras will be allowed unless specifically agreed to in writing in advance by Buyer.

10) FORCE MAJEURE. Neither the Seller nor the Buyer shall be held responsible for delays in performance or failures of performance due to strikes, fires, force majeure, or other such circumstances reasonably beyond the control of the parties.

11) INDEMNITY. Seller agrees to indemnify and keep indemnified Buyer and to hold and save Buyer harmless from and against any and all claims, demands, liabilities, losses or expenses of whatsoever kind and nature which Buyer shall or may at any time sustain or incur by reason of, in consequence of, or arising out of the manufacture, sale or delivery by Seller of the goods and/or services described in this Purchase Order to Buyer or with respect to any property of the Buyer held by Seller. This indemnity clause shall not be construed to preclude or limit any other rights or remedies available to the Buyer against the Seller.

12) INSPECTION. All goods shall be received subject to Buyer's right of inspection and rejection at any time after receipt. If this Purchase Order calls for delivery in installments, Buyer shall have such right of rejection regardless of whether or not the nonconformity substantially impairs the value of the installment and regardless of the curability of such nonconformity. Buyer shall have the right to perform adequate tests to determine whether goods conform to the contract. Without limiting the generality of the foregoing, Seller, at Buyer's request, shall permit Buyer's inspector(s) to have access to Seller's plant for the purpose of inspecting goods covered by the Purchase Order to work in process for production of said goods, but such inspection shall not be deemed to preclude Buyer's subsequent inspection and rejection of such goods as provided in the first sentence of this Section. Seller, without additional costs to Buyer, shall provide all reasonable facilities and assistance for the safety of such inspection. If such inspection discloses, in Buyer's good faith opinion, that the progress made by Seller to that date with respect to the goods is such that Seller will be unable to make timely shipments to Buyer, in accordance with the Purchase Order delivery schedule, or that all or any material part of the goods are not in accordance with Buyer's specifications, Buyer shall have the right to cancel any unshipped portion of the goods by written notice to Seller, without liability for breach of contract. If goods shipped pursuant to this Purchase Order are nonconforming and are returned to Seller for repair or replacement, such goods shall be designated upon return to Buyer as goods, which have been previously rejected. No goods returned by Buyer and designated "credit only" shall be returned by Seller to Buyer.

13) INSTALLATION. If this Purchase Order requires Seller to furnish the services of its supervisor, expert or other employee to perform work on the Buyer's premises in connection with installation or any other matter under this contract, Seller agrees, whether or not a separate charge is to be made for said services, that such supervisor, expert or other employee of the Seller in performing such services is not and shall not be deemed to be an agent or employee of the Buyer. Seller assumes full responsibility for the acts and omissions of such persons and agrees to hold the Buyer harmless from any claims or damage whatever arising there from. Seller assumes exclusive liability for any payroll or taxes imposed upon the employer by any federal, provincial, state or local law or regulation as to such persons.

14) INSURANCE. Seller shall at its expense purchase and maintain general liability, products liability and/or professional errors and omissions insurance in amounts sufficient to satisfy any claims or liabilities which Seller might incur arising out of the manufacture, sale or delivery of any of the goods and/or services described in this Purchase Order. Such insurance policy shall provide coverage for the satisfaction of any liability of the Seller to the Buyer resulting from operation of the indemnity provisions of this contract, or from other operation of law, as well as for the satisfaction of any liability of Seller to any third party or parties. Any insurance purchased by Seller to cover loss or damage to the goods in transit to Buyer shall be solely at Seller's expense.

15) LIENS. All goods to be delivered by Seller hereunder and all property to be rendered to Buyer shall be free and clear of any and all liens and encumbrances whatsoever.

16) INTELLECTUAL PROPERTY RIGHTS. The term "Intellectual Property" as used in this Agreement shall include, without limitation, all rights of copyright, patent, trade secret, trademark, service mark, trade dress, artistic and moral rights, mask rights, character rights, publicity rights, and any and all other proprietary rights of any kind whatsoever relating to any product purchased or developed pursuant to this Purchase Order together with any and all applications, registrations, renewal and extension rights, and rights to sue for any past, present or future infringement. Any goods and/or services purchased by Buyer under this Purchase Order specifically developed for Buyer hereunder, including without limitation all improvements and/or modifications, shall be exclusively owned by the Buyer. Seller expressly acknowledges and agrees that any such goods and/or services constitute a "work made for hire" pursuant to the copyright laws of the United States or equivalent under any other applicable law. To the extent, if at all, the goods and/or services do not constitute a "work made for hire", the Seller hereby transfers, sells and assigns to the Buyer, all of its worldwide right, title and interest in and to such goods and/or services, including without limitation, all Intellectual Property rights. Nothing contained herein shall grant Buyer any ownership interest in any Intellectual Property of Seller utilized by Seller or contained in goods and/or services provided to Buyer by Seller hereunder not specifically developed for Buyer.

17) CONFIDENTIAL INFORMATION. All information provided by Buyer to Seller hereunder relating to the subject matter of the Purchase Order, including without limitation, methods, processes, designs, marketing plans, strategies, customer and financial information shall be deemed to be "Confidential Information" and shall be maintained in confidence by Seller. Seller shall not divulge to any other person or organization or use in any manner whatsoever, directly or indirectly, for any reason whatsoever, any Confidential Information provided to Seller hereunder or which Seller learns through performance of its obligations hereunder without receiving the prior written consent of the Buyer. Seller shall take such actions as may be necessary to ensure that its employees and agents are bound by the provisions of this Section. The foregoing obligations of confidentiality and restrictions on use shall not apply to information, which is a public domain at the time of disclosure or subsequently enters the public domain through no fault of the Seller.

18) INTELLECTUAL PROPERTY INFRINGEMENT. Seller warrants that the goods purchased hereunder do not infringe upon any third party Intellectual Property and covenants and agrees to protect, indemnify and hold the Buyer, its successors, assigns customer and users of its products, harmless from and against all claims, damages, judgments, expenses and losses arising from the infringements of any Intellectual Property, and the Seller, after notice shall appear and defend at its own expense all suits and proceedings at law or in equity instituted against the Buyer and shall pay any awards assessed against the Buyer in such proceeding as same are based upon any claim that goods purchased hereunder constitute an infringement of any Intellectual Property.

19) PAYMENT. Buyer shall have the right to pay according to discount terms offered and accepted. The terms on the face of the Purchase Order will be paid from the date of receipt and acceptance of the goods, or completion and acceptance of services, or the date of receipt of correct invoices prepared in accordance with the terms of this Purchase Order, whichever date is later. All payments, invoices, the Purchase Order, statements, confirmations and the like shall be stated or paid in United States Dollars unless otherwise specifically agreed by the Buyer. This Section shall not be construed to limit the period of Buyer's right of inspection set forth in the inspection Section of this Purchase Order.

20) PRICE. The price for each item covered by this Purchase Order shall be the price as shown for such items on the face of this Purchase Order or, when the price is estimated or not shown the price of Seller in effect on the date of delivery. All prices charged to the Buyer for goods and/or services shall be no less favorable than pricing offered to Seller's other customers for like services and/or like quantities of goods of like grade and quality and under substantially similar terms and conditions of sale. No change in price without Buyer's specific consent and authorization in writing will be accepted.

21) QUANTITIES. The specific quantity ordered must be delivered in full and not be changed without Buyer's consent in writing. Any different quantity is subject to Buyer's rejection and return at Seller's expense unless Seller has obtained Buyer's prior written consent to change in specific quantity so ordered.

22) ROUTING. All material shall be shipped pursuant to the shipping instructions found on the face of this Purchase Order.

23) INVOICES. Will be sent to the "bill to" location on the face of the Purchase Order. All packages, packing slips and invoices must be plainly marked with the Purchase Order number shown. Where necessary all documentation will comply with customs or other governing regulatory agency for the importation of goods into the country indicated as the deliver to address on the face of the Purchase Order.

24) CERTIFICATES OF ORIGIN, MARKING OF ORIGIN, NAFTA certificates of origin and, where applicable, on an annual basis, blanket NAFTA certificates of origin, will be required on an annual basis for all NAFTA qualified products. If at any time during the period which the blanket NAFTA certificate of origin covers, it is determined that a good no longer meets the required NAFTA qualifications, the Buyer must be notified by Seller in writing, within fifteen (15) days. When necessary, a revised NAFTA certificate of origin must also be issued. Where Seller fails to make a good faith effort to comply with NAFTA regulations and it causes Buyer to incur additional customs duties, fines or other costs, Seller will be responsible for reimbursement of said costs to Buyer. Products will be marked as required under applicable law, regulation or standard as to, but not limited to, country of origin, content, ingredients, and compliance with or certification under, applicable laws, regulations and/or standards.

25) SUSPENSION OF WORK. Buyer may at any time or times order Seller in writing to suspend, delay or interrupt all or any part of the work for a period of not to exceed ninety (90) consecutive days. An adjustment shall be made for any changes in the cost of performance (excluding profit), delivery or performance dates, and any other contractual provisions affected hereby. However, no adjustments shall be made for any suspension, delay or interruption to the extent that performance would have been so suspended, delayed or interrupted by any other cause including the breach, fault or negligence of Seller nor shall any adjustment be made under this clause for any suspension, delay or interruption for which an equitable adjustment is provided for or excluded under any other provision of this contract. No claim under this clause shall be allowed unless asserted in writing within fifteen (15) days after the termination of such suspension, delay or interruption.

26) TAXES. Except for GST, VAT or state sales and/or use taxes, if applicable, the price for goods and/or services covered by this Purchase Order is inclusive of all duties, taxes, fees, excise and/or similar charges which are now or may hereafter be imposed by any federal, provincial, state, local, or other public authority with respect to the manufacture and sale of such goods, any services to be rendered by Seller hereunder, or this Purchase Order itself. Seller shall separately state on its invoice the amount of any GST, VAT or state sales and/or use tax applicable to the sale of the goods and/or services covered by this Purchase Order.

27) TERMINATION. Buyer may terminate all or any part of this Purchase Order at any time or times without cause by so notifying Seller in writing. In the event of termination by Buyer without cause, Buyer shall be responsible for termination charges on parts manufactured to but not in excess of sixty (60) days in advance of the Purchase Order schedule provided however, that Seller must submit its termination claim to Buyer within thirty (30) days after the effective date of termination. Seller hereby waives any right, which it may have to specific performance under this contract.

Buyer may terminate all or any part of this Purchase Order without incurring any liability upon the occurrence of any of the following causes:

a) A material breach of any term of this Purchase Order by Seller, including, but without limitation, untimely shipments or shipments of goods which do not conform to the contract.

b) Assignment or attempted assignment of this Purchase Order in whole or in part by Seller without Buyer's written consent.

c) The filing by or against Seller of any insolvency or bankruptcy proceedings or proceedings for reorganization, receivership or dissolution or

d) Any material adverse change in the financial condition of Seller, which Buyer in good faith believes to impair the likelihood that Buyer will receive timely and full performance of the contract.

If after notice of termination of this Purchase Order for cause, it is determined for any reason that Seller was not in default or that the default was excusable, the rights, obligations and liabilities of the parties shall be the same as if the notice of termination had been issued pursuant to the first paragraph of these Termination provisions, and Seller shall have no other rights or remedies against Buyer for wrongful termination of the contract.

28) TITLE AND RISK OF LOSS. Except as otherwise expressly provided herein, title to and risk of loss on all conforming goods shipped by Seller to Buyer shall pass to Buyer upon final acceptance of the goods by Buyer.

29) VALIDATION. This Purchase Order is valid only if signed by an authorized agent of Buyer.

30) WAIVER. No waiver by Buyer of any breach, default, condition, covenant, right or remedy arising out of or connected with this contract shall be effective unless in writing signed by an authorized agent of Buyer. A waiver by Buyer of any breach of the terms and conditions of this Purchase Order shall not constitute a waiver of any similar or other breach, default, condition, covenant, right or remedy.

31) WARRANTY SPECIFICATIONS. Seller expressly warrants that all goods and/or services, and workmanship with respect to the goods, covered by this Purchase Order or other description, drawings, specifications or samples furnished by Seller or Buyer will be in exact accordance with such Purchase Order, description, drawings, specifications or samples and free from defects in design (except to the extent such defective design is attributable to Buyer), materials and workmanship and will be merchantable and fit for their particular purpose(s). Such warranty shall survive delivery and shall not be deemed waived either by reason of Buyer's acceptance of said goods and/or services or by payment for them.

865918v3 81406

UI 00809

EXHIBIT

B

**From:** "Pradeep Gupta" <Pradeep@uniqueindl.com>
**To:** "MIKE BRITTEN" <MIKE.BRITTEN@uponor-usa.com>, "Unique Industrial - Jay Malani" <jay@uniqueindl.com>
**Date:** 8/28/2006 11:52:02 AM
**Subject:** Re: Unique Meeting

Mike Britten
Risk Manager
Uponor USA
Monday August 28, 2006

Mike,
With reference to your summary dated 8/25/06 of the meeting between Uponor and Unique and
the subsequent emails exchanged, this is to confirm the following :
1. Swivel Nut Part W 8085/P4645050.
Sheila King has confirmed she is arranging to send us back all of the defective parts and we have agreed to issue a check for 50% of the total claim of $ 17,478.22 in full settlement of these claims.
Uponor will also advise regarding proactively replacing similar parts already installed at Palm Harbor Homes.

2. Brass PEX fittings
Unique confims that it will be responsible for any claims arising out of defective product. Claims under $ 5,000 will be reimburesd directly by Unique upon Uponor providing written back up and failed part for each claim. Claims exceeding this amount will be consolidated and submitted to Unique's insurance company for settlement.
Uponor agrees to take the remaining inventory of Uponor parts in Unique's inventory, on the water/already produced at the factory. Unique will take responsibility for these parts regarding quality and conformity to Specifications.

With regard to our correspondence regarding fittings from National Craft, please note that when we first started business with RTI we were supplying 1/2" fittings from Barstock but later on RTI told us to change to Forgings since
they were getting the same parts from National Craft as Forgings.

Sincerely,
Pradeep K. Gupta
----- Original Message -----
From: "MIKE BRITTEN" <MIKE.BRITTEN@uponor-usa.com>
To: <jay@uniqueindl.com>; <pradeep@uniqueindl.com>
Sent: Friday, August 25, 2006 2:49 PM
Subject: Unique Meeting

Pradeep and Jay--

It was a pleasure meeting you yesterday in our office, and I hope you had an uneventful flight back to Texas. As requested yesterday, below please find a summary of what was agreed to between Uponor and Unique.

Nut Matter
--Uponor and Unique agree to split 50%-50% for the nut claims already

EXHIBIT
C

**From:** "Pradeep Gupta" <Pradeep@uniqueindl.com>
**To:** "MARK DUBANOSKI" <MARK.DUBANOSKI@uponor-usa.com>, <Hetal@uniqueindl.com>, "Unique Industrial - Jay Malani" <jay@uniqueindl.com>
**Date:** 9/15/2006 5:19:18 PM
**Subject:** Re: Uponor: Product Movement

Fri Sep 15, 2006
Mark
This refers your email to Hetal.
Regarding your question about the current inventory value, Hetal had told you that this was due to the following :
1. Wirsbo did not take any shipments for the past 2 1/2 months but at the same time our supplier had already made shipments that were on the water.
2. The $ 1.4 million includes Houston stock + on water product + product already produced.

We had told you during our meeting and subsequently confirmed in writing that Unique will stand behind any claims pertaining to our product.

- Regarding testing a bag-package of each item, as you know our product meets all the requirements of F 1807 except the Lead which is a little lower. It is for this that we are standing behind our product in case there are any claims etc.
- All the claims on the Pex fittings have been on the 1/2 " size . We have had no complaints on the other sizes. We have been supplying Uponor with millions of PEX fittings for almost 4 years.

Regarding the Swivels , please note we changed out the Plastic nuts and have had no problems reported with the new nuts which were approved by you.

As we agreed during our meeting you will take our inventory and in return we will take care of the existing claims plus stand behind any future claims.

Best Regards
Pradeep
----- Original Message -----
From: "MARK DUBANOSKI" <MARK.DUBANOSKI@uponor-usa.com>
To: <Hetal@uniqueindl.com>; <Pradeep@uniqueindl.com>
Cc: "MIKE BRITTEN" <MIKE.BRITTEN@uponor-usa.com>
Sent: Friday, September 15, 2006 4:51 PM
Subject: Re: Uponor: Product Movement

Hi Hetal,

Per our discussion this week I am looking at what we can do to help you on this. Keep in mind the inventory at Unique in August was $533,000 when we had our discussions, not the $1.4 mio that you sent earlier this week. Our sales staff has the list and we will do our best to help sell off this inventory.

I think we need to also figure out whether this product meets the F1807 spec or not before we try to sell into the market. Could you provide me with a package of each fitting so we can put through material composition testing?

There is also major concerns about the swivel parts as we are have issues in the field with these. We will have to test the plastic nuts on these to

EXHIBIT
D

<mailto:hetal@uniqueindl.com> hetal@uniqueindl.com

---

From: Hetal Bhavsar [mailto:Hetal@uniqueindl.com]
Sent: Monday, September 11, 2006 9:01 AM
To: 'MARK.DUBANOSKI@uponor-usa.com'
Cc: 'PAUL MILFORD'; 'Pradeep Gupta'; 'jay@uniqueindl.com'
Subject: Uponor: Current stock details-on water-ready overseas

Hi Mark,

Subsequent to your meeting with Jay and Pradeep on Aug 24, please note we have gathered all the stock details for pex fittings. On the attached spreadsheet, you will find current Houston stock, current on water, and product ready overseas details with a collective extended value of around $1.4 million.

All product is estimated to be in Houston inventory by around the end of Nov. 2006. We will continue to send weekly inventory status to Paul/Jim so that product may be released accordingly. Please note we would request that all product be released over the next four months by Dec 31, 2006.

In addition, should there be any non-conforming product, Unique will issue an immediate credit to Uponor.

The pricing on these items has been calculated as per LME $7500/T. All of the product in question was purchased at LME $ 7500/T thru at least $LME 8300 and higher in some cases.

Please review the attached spreadsheet and let me know if you have any questions.

EXHIBIT

E

Best Regards,

Hetal Bhavsar

Sales Manager

Unique Industrial Product Company

12600 Cardinal Meadow

Sugar Land, TX 77478

Office: 281.275.3904

Mobile: 832.452.3446

Fax: 831.665.5632

<mailto:hetal@uniqueindl.com> hetal@uniqueindl.com

**CC:** "'Pradeep Gupta'" <Pradeep@uniqueindl.com>, <jay@uniqueindl.com>

**uponor**

5925 148th Street West
Apple Vallley, MN 55124
Tel: (952)891-2000
Fax: (952)891-5390

Vendor: UNIQUE INDUSTRIAL PRODUCT COMPAN
12600 CARDINAL MEADOW
SUGAR LAND,TX 77478
United States

Ship To: 2300 West Highway 13
Suite 400
Burnsville,MN 55337
United States

Bill To: 5925 148th Street West
Apple Valley,MN 55124
United States

**Purchase Order**

| Order Number | Revision | Page |
|---|---|---|
| 825548 | 3 | 1 |

This purchase order must appear on all invoices, packing lists,cartons, and correspondence related to this order.

| Date of Order | Buyer |
|---|---|
| 04-OCT-06 | W Twomey |
| **Date of Revision** | **Buyer** |
| 04-DEC-06 | W Twomey |

| Customer No. | Vendor No. | Payment Terms | Freight Terms | F.O.B. | Ship Via |
|---|---|---|---|---|---|
| | 102647 | NET60 | Prepaid | Destination | Best Way |

| Confirm To / Telephone | Fax No. | Request or Deliver To: |
|---|---|---|
| PRADEEP GUPTA | (831) 665-5632 | |

| Line | Part Number / Description | Rev | Delivery Date | Quantity | Unit | Unit Price | Extension | Tax |
|---|---|---|---|---|---|---|---|---|
| 1 | Misc. SSC Inventory<br><br>With P-Pex marking specific to Uponor, Inc. as outlined in attached Unique Industrial Product Company Houston Inventory Spreadsheet dated 9/6/06. Acceptance of this product is subject to the attached Uponor Inc. terms and conditions and the product meeting Uponor's quality testing, F1807 standards, and all other applicable represented standards.<br><br>Unique Inventory Spreadsheet of 9/6/06 revised by Uponor 10/10/06 to reflect value of $750,000.00 per revision #2 of this Purchase Order.<br><br>12/5/06 – "Revision reflects results of Uponor, Inc. test results, more test results to follow."<br><br>Line 1 is value of product still in testing. Lines 2-14 reflects parts that pass testing. All other parts failed testing and are not accepted by Uponor. | | 24-OCT-06 | 1.0 | EACH | 200165.32 | 200,165.32 | N |
| 2 | P2187550<br>Your #: TRUCK 1<br>SSC Brass Branch Manifold, 3 outlet | -AB | 05-DEC-06 | 8300.0 | EACH | 2.79 | 23,157.00 | N |
| 3 | P2187557<br>Your #: TRUCK 1<br>SSC Brass Flow-through Manifold, 3 outlet | -AB | 05-DEC-06 | 8000.0 | EACH | 2.92 | 23,360.00 | N |
| 4 | F5120625<br>Your #: TRUCK 1<br>5/8" Metal Drop Ear Bend Support | -AE | 05-DEC-06 | 8000.0 | EACH | .5 | 4,000.00 | N |

| Total: | Continued |
|---|---|

Authorized Signature

EXHIBIT
F

**uponor**

5925 148th Street West
Apple Vallley, MN 55124
Tel: (952)891-2000
Fax: (952)891-5390

Ship To: 2300 West Highway 13
Suite 400
Burnsville,MN 55337
United States

Bill To: 5925 148th Street West
Apple Valley,MN 55124
United States

Vendor: UNIQUE INDUSTRIAL PRODUCT COMPAN
12600 CARDINAL MEADOW
SUGAR LAND,TX 77478 United States

**Purchase Order**

| Order Number | Revision | Page |
|---|---|---|
| 825548 | 3 | 2 |

This purchase order must appear on all invoices, packing lists,cartons, and correspondence related to this order.

| Date of Order | Buyer |
|---|---|
| 04-OCT-06 | W Twomey |
| **Date of Revision** | **Buyer** |
| 04-DEC-06 | W Twomey |

| Customer No. | Vendor No. | Payment Terms | Freight Terms | F.O.B. | Ship Via |
|---|---|---|---|---|---|
| | 102647 | NET60 | Prepaid | Destination | Best Way |

| Confirm To / Telephone | Fax No. | Request or Deliver To: |
|---|---|---|
| PRADEEP GUPTA | (831) 665-5632 | |

| Line | Part Number / Description | Rev | Delivery Date | Quantity | Unit | Unit Price | Extension | Tax |
|---|---|---|---|---|---|---|---|---|
| 5 | P2197550<br>Your #: TRUCK 1<br>SSC Brass Branch Manifold, 4 outlet | AB | 05-DEC-06 | 4800.0 | EACH | 2.92 | 14,016.00 | N |
| 6 | P4701775<br>Your #: TRUCK 1<br>SSC Brass Reducing Tee, 1" PEX x 3/4" PEX x 3/4" PEX | AA | 05-DEC-06 | 2850.0 | EACH | 1.31 | 3,733.50 | N |
| 7 | P4705575<br>Your #: TRUCK 1<br>SSC Brass Reducing Tee, 1/2" PEX x 1/2" PEX x 3/4" PEX | AA | 05-DEC-06 | 10200.0 | EACH | .67 | 6,834.00 | N |
| 8 | P4237575<br>Your #: TRUCK 2<br>SSC Drop Ear Elbow, 3/4" PEX x 3/4" NPT | AA | 05-DEC-06 | 600.0 | EACH | 1.38 | 828.00 | N |
| 9 | P4537575<br>Your #: TRUCK 3<br>SSC Brass Plug for 3/4" PEX | AA | 05-DEC-06 | 600.0 | EACH | .24 | 144.00 | N |
| 10 | P4701150<br>Your #: TRUCK 3<br>SSC Brass Reducing Tee, 1" PEX x 1" PEX x 1/2" PEX | AA | 05-DEC-06 | 7600.0 | EACH | 1.32 | 10,032.00 | N |
| 11 | P4701175<br>Your #: TRUCK 3<br>SSC Brass Reducing Tee, 1" PEX x 1" PEX x 3/4" PEX | AA | 05-DEC-06 | 694.0 | EACH | 1.32 | 916.08 | N |

Total: Continued

Authorized Signature

UI 00807

uponor

5925 148th Street West
Apple Vallley, MN 55124
Tel: (952)891-2000
Fax: (952)891-5390

Vendor: UNIQUE INDUSTRIAL PRODUCT COMPAN
12600 CARDINAL MEADOW
SUGAR LAND,TX 77478 United States

Ship To: 2300 West Highway 13
Suite 400
Burnsville,MN 55337
United States

Bill To: 5925 148th Street West
Apple Valley,MN 55124
United States

## Purchase Order

| Order Number | Revision | Page |
|---|---|---|
| 825548 | 3 | 3 |

This purchase order must appear on all invoices, packing lists,cartons, and correspondence related to this order.

| Date of Order | Buyer |
|---|---|
| 04-OCT-06 | W Twomey |
| Date of Revision | Buyer |
| 04-DEC-06 | W Twomey |

| Customer No. | Vendor No. | Payment Terms | Freight Terms | F.O.B. | Ship Via |
|---|---|---|---|---|---|
| | 102647 | NET60 | Prepaid | Destination | Best Way |

| Confirm To / Telephone | Fax No. | Request or Deliver To: |
|---|---|---|
| PRADEEP GUPTA | (831) 665-5632 | |

| Line | Part Number / Description | Rev | Delivery Date | Quantity | Unit | Unit Price | Extension | Tax |
|---|---|---|---|---|---|---|---|---|
| 12 | P4663850<br>Your #: TRUCK 3<br>SSC Brass Swivel Elbow with Plastic Nut, 3/8" PEX x 1/2" FIP | -AA | 05-DEC-06 | 2650.0 | EACH | .48 | 1,272.00 | N |
| 13 | P4521075<br>Your #: TRUCK 4<br>SSC Brass Male Threaded Adapter, 1" PEX x 3/4" NPT | -AA | 05-DEC-06 | 190.0 | EACH | .82 | 155.80 | N |
| 14 | P4531000<br>Your #: TRUCK 4<br>SSC Brass Plug for 1" PEX | -AA | 05-DEC-06 | 7600.0 | EACH | .42 | 3,192.00 | N |
| | | | | | | Total: | 291,805.70 | |

Authorized Signature

UI 00808

**From:** "Jay Malani" <jay@uniqueindl.com>
**To:** "MARK DUBANOSKI" <MARK.DUBANOSKI@uponor-usa.com>
**Date:** 10/9/2006 9:48:52 AM
**Subject:** Re: Uponor: PO # 825548

Dear Mark,

Good Morning.

We accept your offer. Thank you very much.

Upnor is a great company we have learnt a lot from you all.

We will co-operate fully and take care of claims and put this issue behind us.

We very much like to continue our business relationship with Uponer and you so we request you to reconsider us as a secondary supplier for Meal Bend supports if possible.

Thanks and Best Regards

Jay Malani

Unique Industrial Products
----- Original Message -----
From: "MARK DUBANOSKI" <MARK.DUBANOSKI@uponor-usa.com>
To: <Hetal@uniqueindl.com>
Cc: <jay@uniqueindl.com>; <Pradeep@uniqueindl.com>; "MIKE BRITTEN" <MIKE.BRITTEN@uponor-usa.com>; "SHEILA KING" <SHEILA.KING@uponor-usa.com>
Sent: Friday, October 06, 2006 4:53 PM
Subject: Re: Uponor: PO # 825548

Hetal,

My agreement to purchase what Unique had in stock and on the water was based on reports you provide us detailing the quantity and value of the inventory. The value in August was $533,477.36, I released PO#825548 at a higher amount, $668,930.57 in good faith based on an updated inventory value report sent September 6, 2006.

In our phone conversation yesterday I said I would entertain an adjustment based on the product on the water. The offer you sent today is not acceptable.

I am willing to make an adjustment to this purchase order. My final offer for this inventory is $750,000, same terms and conditions apply. This offer represents a 12.12% increase per part on the inventory shown on your September 6th value report.

If this is not acceptable, please consider PO#825548 null and void.

Regards
Mark Dubanoski

EXHIBIT
6

**From:** SHEILA KING
**To:** Bhavsar, Hetal; pradeep@uniqueindl.com
**Date:** 11/29/2006 3:02 PM
**Subject:** Ryan/Foley and Palm Harbor Requests

Hetal,
To follow up on our phone conversation we have received the requests for replacing installed Unique fittings from Ryan/Foley and Palm Harbor. Per our previous meetings we agreed we would pass the requests on to you. We need to respond to our customers by the end of Thursday, November 30th.

**Ryan Homes** has approximately 140 homes with Unique fittings installed by Foley Plumbing during the June-August timeframe. They have laid out the following approximate replacement costs:

(1) 100% replacement of ASTM 1807 fittings in each home - Rough Order of Magnitude of $30,000 per home

a. Homeowner will have to reside in a hotel while work is done. Water would need to be off for a number of days.

b. Location and access to fittings will require removal/replacement of many installed features including but not limited to drywall, tile, vanities, custom paint, and wallpaper.

c. Will involve the development of a Project Management Office to oversee the coordination of the subcontractors performing the work and scheduling a convenient time with the homeowner. (Note: Ryan is currently not staffed to perform this type of work and would require the contracting of a firm that specializes in this type of work).

d. Major disruption.

2) 100% replacement of the homes roughed-in in June (estimated 73 homes @ $30,000 per home) and sampling of fittings in house roughed-in in July/August (estimated 67 homes @ $5,000 per home). If sampling of fittings in these homes shows failed or non-compliant fittings then the costs go up to the $30,000 range to replace all.

**Palm Harbor:**

Has approximately 5000 homes with a Unique swivel nut installed that Palm Harbor wants removed. Each home has 2-3 fixtures with this nut. Palm Harbor does not want to handle the replacement, but feels Uponor and Unique have a responsibility to go out and do this. Of course Uponor would expect that to fall on Unique. It would probably require contacting all of the homeowners and arranging a contractor to go out and do the replacement with an approved replacement parts. These homes are in several states. If Palm Harbor is forced to do the replacement themselves the cost will be $250 a home.

We can discuss in our conference call tomorrow, but it is important that we come to an understanding on the level of commitment Unique can offer to these customers so we can respond to them.

Best Regards,
Sheila

Sheila King
Supply Contracts Manager
Uponor North America
5925 148th Street West
Apple Valley, MN 55124

EXHIBIT
H

# EXHIBIT B

**METALLURGICAL TECHNOLOGIES, Inc., P.A.**
*Engineering, Testing & Analysis – Scanning Electron Microscopy*
160 Bevan Drive Mooresville, NC 28115 • Phone 704-663-5108 Fax 704-662-0898 • www.met-tech.com

**October 31, 2008**

Mr. Howard Lieber,
FISHER KANARIS, PC
200 South Wacker Dr., 22nd Floor
Chicago, IL 60606
(312)474-1415

Re: Analysis of Unique Plastic Swivel Nuts and Brass Plumbing Fittings

Dear Mr. Lieber,

Per your request, I am writing to summarize my experience with plastic swivel nuts and brass insert plumbing fittings distributed by Unique Industrial Product Company.

I am currently employed by Metallurgical Technologies, Inc. as a senior materials engineer in Mooresville, North Carolina. I have approximately 14 years of experience in fracture interpretation, root-cause failure analysis, investigative chemistry, and material analysis as indicated on the enclosed curriculum vitae. In December 1993, I graduated *magna cum laude* with a B.S.E. degree in Materials Science and Engineering from Arizona State University.

From July 2002 through October 2007, I was employed by Uponor North America (formerly Uponor Wirsbo) as Manager of Material Analysis. In that capacity, I was responsible for the creation and management of an analytical services laboratory dedicated to root cause failure analysis, investigative chemistry, and materials engineering support for Uponor North America. During my employment with Uponor, I personally evaluated numerous new and field-returned plastic swivel nuts and brass insert plumbing fittings supplied by various companies, including those distributed by Unique Industrial Product Company. Clusters of failures had occurred, over a relatively short time period, in swivel nuts and brass fittings provided by Unique. All of the failed brass fittings associated with this analysis were labeled "F1807", and all exhibited a "cNSF us-pw" demarcation.

<u>Summary of Conclusions</u>:

After extensive evaluation of the new and failed components, it is my opinion that the swivel nuts and brass insert plumbing fittings failed due to manufacturing defects. More specifically, it is my opinion based on a reasonable degree of engineering certainty that:

1. The plastic swivel nuts fractured due to : a) low cycle fatigue initiating at areas of stress concentration in the threads and b) due to excessive gas

porosity in the walls of the nuts. The gas porosity consumed a substantial portion of the wall thickness, effectively weakening the nut. This allowed fatigue cracks to initiate in the threaded region of the nut where they would not have otherwise initiated. The weakened parts were made even more vulnerable to fatigue crack initiation by stress concentrations in the threaded region resulting from non-uniform thread faces, undercutting in the thread roots, and sharp corners associated with a square thread root geometry. All of these product deficiencies (porosity, non-uniform thread faces, undercutting in the thread roots, and square thread root geometry) were indicative of a poorly controlled molding process and/or mold design.

2. Laboratory testing of new, unused swivel nuts from Generations I, II, and III revealed similar defects which created a significant probability that these components would fail prematurely if placed into service. Uponor could not have sold these components in good conscience knowing that they would not reasonably be expected to perform as intended. Uponor acted responsibly and with integrity by rejecting the defective swivel nuts.

3. The brass insert fittings fractured due to stress corrosion cracking resulting from multiple factors including the combined effects of excessive residual stress in the brass material (attributed to forging and machining of the fittings without proper stress relief), coupled with an incompatible chemical introduced during the manufacturing process. Furthermore, testing performed by companies retained by both Uponor and Unique revealed that many of the fittings that fractured during service did not conform to the chemical requirements of ASTM F1807.

4. Evidence of stress corrosion cracking was identified in new, unused fittings that were understood to have been manufactured during approximately the same time frame as the failed fittings. Many of these fittings, which were retrieved from plumbing distributor's shelves in Minnesota where a significant number of brass fitting failures had occurred, were still sealed in their original packaging from Unique Industrial Product Company when I received them for analysis.

5. Laboratory testing of new, unused brass insert fittings revealed that a significant amount of Uponor's existing inventory of Unique brass insert fittings exhibited an alloy chemistry that did not conform to the requirements of ASTM F1807. For these fittings to be used with PEX tubing for potable water distribution, the fittings were required to conform to ASTM F1807. Thus, Uponor could not sell these components knowing that the alloy chemistry was not in compliance, particularly given that many of the fittings that failed during service also exhibited a non-conforming alloy chemistry. Uponor acted responsibly and with integrity by rejecting the non-conforming brass insert fittings.

6. Opinions expressed by Dr. Charles Hayes in a reported provided by Unique Industrial Product Company are inaccurate, ill-supported, and in direct contradiction to data presented in the Hayes' report.

**Evaluation of Plastic Swivel Nuts and Brass Insert Fittings**

Plastic Swivel Nuts

Detailed laboratory testing of field-returned plastic swivel adaptors revealed that the swivel nuts fractured due to a fatigue fracture mechanism resulting from manufacturing defects in the molded swivel nut. Specifically, the failures were attributed to excessive porosity and poorly molded threads, which significantly weakened the parts and provided stress concentrations that caused the cracks to fail by fatigue. In some cases, the porosity existed as clusters more than 0.5-inches long. The swivel adaptors were evaluated by visual inspection, stereo microscopy, metallography, radiography, Fourier transform infrared spectrometry, scanning electron microscopy, differential scanning calorimetry, and energy dispersive x-ray spectroscopy.

Radiography and metallography performed on multiple lots of new, unused swivel nuts (Generations I, II, and III) revealed porosity and/or poorly molded threads, similar to what was observed in previously evaluated field failures. Given that the new swivel nuts exhibited manufacturing defects that were virtually identical to defects that caused the field-returned product to fail, I concluded that the new swivel adaptors would be expected to also fail prematurely in a typical service environment, and that they should not be installed.

Multiple sets of "Generation II" and "Generation III" swivel nuts were evaluated in an effort to determine whether the manufacturing defects had been corrected and whether the nuts were suitable for their intended application. Laboratory testing revealed similar manufacturing defects (porosity and/or poorly molded threads) in each generation of new product evaluated. This indicated that the new production swivel nuts were also unsuitable for the intended application, and that they also would likely fail prematurely if placed into service.

Since the porosity and irregular thread geometries observed in these components resulted from poorly controlled manufacturing processes rather than from a material deficiency, it was not surprising that 1) similar defects were observed in both nylon and polyacetyl production swivel, and 2) the nylon Generation III production swivel nuts exhibited porosity that was *not* observed in a previously-evaluated set of five nylon prototype swivel nuts. Comparative analysis of similar nylon swivel nuts manufactured by Marshall Brass revealed little or no porosity and uniform thread geometries that were less conducive to fatigue crack initiation. This further indicated that the defects noted in the Unique swivel nuts resulted from poorly controlled manufacturing processes rather than from a material deficiency.

An engineering drawing representing the nylon swivel nut to be provided by Unique showed a fully intact wall with no indication that some level of discernible porosity would be allowed in the swivel nut. Further, the engineering drawing contained no detail regarding the thread root geometry, and it included no indication that undercutting or non-uniform thread faces would be allowed.

In my opinion, Unique Industrial Product Company did not exercise reasonable care to insure that the swivel nuts they distributed to Uponor were free of manufacturing defects. The gross porosity that weakened these swivel nuts and caused them to fail could have been detected by simply weighing production samples. No special equipment or expertise was required to detect these defects, as the porosity was often visible to the unaided eye if the swivel nuts were visually inspected under bright lighting.

Uponor could not sell the Generation II and III production swivel nuts, knowing that these components were unsuitable for the intended application, were not in compliance with industry standards, and that there was a significant probability that the nuts would fail prematurely during service. It was appropriate for Uponor to reject and quarantine the defective swivel nuts received from Unique.

Brass Plumbing Fittings:

Detailed laboratory testing of failed brass insert fittings revealed fracture features consistent with transgranular stress corrosion cracking initiating at the interior, machined surface of the fittings. These fractures resulted from multiple factors, including the combined effects of excessive residual stress in the brass material (attributed to forging and machining of the fittings without proper stress relief), coupled with an incompatible chemical environment and variable metallurgical composition. The failed brass fittings were evaluated by visual inspection, stereo microscopy, metallography, scanning electron microscopy, energy dispersive x-ray spectroscopy, and optical emissions spectrometry.

Unusually pronounced, atypical machining marks were noted at the interior surfaces of the brass fittings adjacent to the separation fractures. The brass material surrounding these machining marks exhibited evidence of heat tinting. Each fracture initiated at the interior surface of the machined outlet, and each fracture exhibited extensive oxidation and corrosion. Metallographic cross-sections through representative fractures revealed a predominantly transgranular fracture morphology, with some evidence of secondary crack branching. When viewed in cross-section, the fractures and crack branches were found to be outlined by corrosion product, indicating that corrosion played a key role in crack propagation. These fracture characteristics were indicative of a stress corrosion cracking fracture mechanism as discussed above.

Given the following facts:

1. Some brass fittings failed in a little as one to two weeks after installation in a typical potable water environment.
2. One brass fitting reportedly fractured during installation, before ever coming into contact with water.
3. Clusters of fitting failures occurred in multiple regions of the US (representing a variety of installers and a variety of water chemistries) within a narrowly defined time period, in an application where no significant failures had previously occurred.

It is my opinion to a reasonable degree of engineering certainty that the stress corrosion cracking experienced by these fittings occurred due to causes associated with the manufacturing process. New brass insert fittings retrieved from the shelves of distributors in Minnesota, where a significant number of brass fitting failures had occurred, were analyzed to determine if cracks were present. Metallographic cross-sections and scanning electron microscopy revealed small cracks at the interior machined surfaces of multiple new brass fittings that had never been installed. Many of these cracked fittings were still sealed in their original packaging from Unique Industrial Product Company when received for analysis.

Chemical analyses performed by Twin City Testing using optical emissions spectrometry revealed that a significant number of failed fittings, and a significant amount of Uponor's existing inventory of Unique brass insert fittings, exhibited an alloy chemistry that did not conform to the requirements of ASTM F1807. Chemical analyses performed by A and M Technical Services Laboratories, Inc. and SHIVA Laboratories at the request of Unique Industrial Product Company also revealed that the brass chemistry did not conform to the requirements of ASTM F1807.

The non-conforming alloy chemistry rendered Uponor's brass fitting inventory unsuitable for the intended application and was an exacerbating factor to the failure mode. Uponor could not sell these brass fittings knowing that the alloy chemistry was not in compliance with ASTM F1807 and that there was a significant probability that the brass fittings would fail prematurely during service. The brass fittings provided by Unique exhibited clear indication of inferior quality and were inconsistent with industry standards. Therefore, it was appropriate for Uponor to reject and quarantine the brass fittings received from Unique.

<u>Documents Reviewed or Relied Upon for the Purpose of this Analysis</u>:

- Various reports, supporting data, photos, and e-mail correspondence generated in association with this analysis during my employment at Uponor
- Swivel nut engineering drawing provided by Unique
- Chemical analysis reports produced by Twin City Testing
- Chemical analysis data produced by SHIVA Laboratories at the request of Unique Industrial Product Company
- Chemical analysis data produced by A and M Technical Services, Inc. at the request of Unique Industrial Product Company
- Radiographic test reports produced by Twin City Testing
- ASTM Standard F1807, "Standard Specification for Metal Insert Fittings Utilizing a Copper Crimp Ring for SDR9 Cross-linked Polyethylene (PEX) Tubing."
- ASTM Specification B16 for machined copper alloy UNS C360000
- ASTM Specification B283 for forged brass alloys UNS C37700 or UNS C36500
- ASM International, <u>ASM Specialty Handbook for Copper and Copper Alloys</u>, Edited by J.R. Davis of Davis and Associates, © 2001.
- ASM International, <u>ASM Metals Handbook, Volume 11, Failure Analysis and Prevention</u>, 1986 and 2002.
- Jones, Denny A., <u>Principals and Prevention of Corrosion</u>, New York, Macmillan Publishing Company, 1992.
- Conlangelo, V. J. and Heiser, F. A, <u>Analysis of Metallurgical Failures – Second Edition</u>, New York, John Wiley & Sons, 1987.
- Dr. Charles Hayes, "Brass Fittings for Water Distribution", reported prepared for Unique Industrial Product Company, January 2007.

Prepared by:

C. L. Smith

Cynthia L. Smith
Senior Materials Engineer

**METALLURGICAL TECHNOLOGIES, Inc., P.A.**
*Engineering, Testing & Analysis - Scanning Electron Microscopy*
160 Bevan Drive Mooresville, NC 28115 • Phone 704-663-5108 Fax 704-662-0898 • www.met-tech.com

**CURRICULUM VITAE: Cynthia L. Smith**

**BACKGROUND:**

Cynthia L. Smith graduated Magna Cum Laude from Arizona State University with a B.S. degree in Materials Science and Engineering. She is a Senior Materials Engineer at Metallurgical Technologies, Inc., an independent metallurgical testing and analysis laboratory. Cindy has 14 years of dedicated experience in failure analysis of metals and polymers, forensic chemistry, corrosion investigations, and analytical testing. She has served as Chairman of professional and collegiate chapters of the American Society for Materials (ASM), and continues to be an active member of both ASM and the Society for Plastics Engineers. She has also served as an expert witness providing litigation support on multiple occasions.

Cindy was first exposed to metallurgical failure analysis during college as a cooperative education student working for Virginia Power Company in Richmond, Virginia. She spent 12 months performing failure analysis, corrosion investigations, and weld replication in the electric power generation industry on a full-time basis.

After graduating from college, Cindy was recruited to join AlliedSignal Engines as a Materials Engineer performing failure analysis of turboprop and gas turbine engine components in support of design, warranty administration, materials and process engineering, and flight safety. At AlliedSignal Engines, Cindy developed a new technique for quantitatively evaluating low cycle fatigue crack growth in a variety of aerospace materials through detailed striation density analyses. She was able to use striation density data to predict fatigue crack initiation life, crack length and crack depth at any point in time after crack initiation (useful in determining if a detectable sized flaw had been missed during previous inspections), and to identify deviations in reported flight patterns. Cindy performed numerous investigations attended by FAA and NTSB representatives, and she effectively interacted with individuals from all levels of the organization.

In 2001, Cindy became Director of Failure Analysis and Investigative Chemistry at Stork Twin City Testing in St. Paul. At Twin City Testing, Cindy managed a team of seven metallurgists and chemists providing engineering consulting in failure analysis, metallurgical engineering, investigative chemistry, polymer analysis, corrosion investigations, and litigation support.

In 2002, Cindy was hired by Uponor North America (formerly Wirsbo) to create and manage an analytical engineering services laboratory dedicated to material research and development, failure analysis, and investigative chemistry. While creating the Material Analysis department, Cindy simultaneously managed a team of six engineers and technicians responsible for Process Engineering related to the production of extruded high density, cross-linked polyethylene pipe. Six months after joining Uponor, Cindy recruited a replacement manager for the Process engineering group and fully launched the Material Analysis Laboratory, providing technical support to Uponor facilities in the United States, Canada, Sweden, and Germany. Services

**(Background, continued)**

included failure analysis of metals and polymers, forensic chemistry, oxidation/degradation analysis of polymers, corrosion studies, competitor product deformulation, and material specification/design support.

In October, 2007, Cindy relocated to North Carolina and joined Metallurgical Technologies, Inc. (MTI) as a Senior Materials Engineer. In this capacity, Cindy provides support to a variety of clients, assisting with failure analysis, forensic chemistry, material testing and analysis, corrosion investigations, and litigation support. She brings several new services to MTI, including microbiologically influenced corrosion evaluations, water chemistry testing as it relates to corrosion, low cycle fatigue striation density analyses for aerospace applications, and failure analysis of polymers.

**PROFESSIONAL MEMBERSHIPS:**

- American Society for Materials (ASM) – former Chairman of local and collegiate chapters
- Society of Plastics Engineers
- American Water Works Association

**EDUCATION:**

Graduate of Arizona State University, Tempe, Arizona, 1993. Degree: B.S. Materials Science and Engineering *(Magna Cum Laude)*

Other Courses: Failure Analysis and Prevention for Polymers, Failure Analysis of Plastic Components, NSF/ANSI Standard 61, Scanning Electron Microscopy, Gas Turbine Engine theory, blue print reading, Leadership for Women.

Presentations: Presenter at various technical functions related to microbiologically influenced corrosion and failure analysis. Certified facilitator for "Managing Interpersonal Relationships" training.

**WORK EXPERIENCE:**

Joined Metallurgical Technologies, Inc. in October 2007 as a Senior Materials Engineer providing materials engineering support and related services in material testing and analysis, forensic chemistry, failure analysis, and corrosion investigations.

Five years at Uponor North America (formerly Wirsbo), Apple Valley, Minnesota. Engineering Manager providing failure analysis and engineering/risk management support for metals and extruded/injection molded polymers through analytical testing and analysis. Responsible for management of the department, all technical results communicated to customers, hands-on failure analysis and fracture interpretation, disposition of claims, materials engineering support for new product development, customized test method development, on-site inspections, and technical interface with executive management, engineering, manufacturing, suppliers, and end-use customers. Brought many new analytical capabilities to Uponor including failure analysis, metallography, optical microscopy, Fourier transform infrared spectrometry (FTIR), Gas

chromatography/Mass Spectrometry (GC/MS), differential scanning calorimetry (DSC), scanning electron microscopy (SEM), energy dispersive x-ray spectroscopy (EDS), optical emission spectrometry (OES), radiography and real-time X-ray imaging, and water chemistry analysis. Authored and reviewed over 700 technical reports.

Six years at AlliedSignal Engines, Phoenix, Arizona. Materials Engineer responsible for failure analysis of gas turbine engine components. Analyses required extensive fractography as well as collection and evaluation of related chemical, mechanical, metallurgical, and system performance data. Technical lead for acetate tape replication and evaluation of microbiologically influenced corrosion. Authored numerous detailed technical reports.

One year at Virginia Power Company, Richmond, Virginia. Analyzed many diverse power generation equipment failures by collecting and evaluating related chemical, mechanical, metallurgical, and system performance data. Monitored cathodic protection levels, soil resistivity, and the performance of corrosion resistant coatings. Produced and presented numerous technical reports. *Cooperative Education Student position.*

**EXAMPLES OF METALLURGICAL AND FAILURE ANALYSIS PROJECTS:**

- Chloride-induced stress corrosion cracking of stainless steel components
- Stress corrosion cracking and dezincification of brass components in various environments
- Microbiologically influenced corrosion of fire protection systems
- Catastrophic low cycle fatigue failure of a gas turbine engine combustor plenum attributed to deviations in customer reported flight patterns
- Casting defect resulting in catastrophic failure of an underground fire protection water main at a nuclear power facility
- Insect damage to PEX tubing causing leaks in plumbing and radiant floor heating systems
- Fatigue cracking in plastic components resulting from injection molding defects
- Low cycle fatigue cracking in gas turbine engine components
- Brittle cracking in cross-linked high density polyethylene (PEX) due to excessive exposure to ultraviolet radiation
- Acetate tape replication of aircraft engine components to non-destructively inspect for fatigue cracks and evaluate alloy microstructure
- Characterization of chemical contamination in polymer components
- High temperature failure of gas-turbine engine components

# EXHIBIT C

THOMAS W. EAGAR, Sc.D., P.E.
ROOM 4-136
MASSACHUSETTS INSTITUTE OF TECHNOLOGY
CAMBRIDGE, MA 02139-4307
617-253-3229
FAX 617-252-1773

October 28, 2008

Fisher Kanaris
200 South Wacker Drive
33rd Floor
Chicago, Illinois 60606

Attention: Howard Lieber

RE: Uponor Brass Fittings for PEX Tubing

Dear Mr. Lieber,

At your request, I have investigated a number of field failures of brass fittings distributed by Uponor. The list of samples which I inspected are given in Appendix A. It was reported that there have been over sixty failures of fittings over less than a year and that additional field failures were reported thereafter.

My investigation has included the following:

1. Visual inspection of both field failures and exemplar fittings using a stereomicroscope. Selected samples were also examined in the Scanning Electron Microscope.

2. Chemical analysis of 13 exemplar fittings as listed in Appendix B.

3. Review of ASTM F1807, B16 and B283.

4. Bend and fracture tests on selected exemplars.

5. Metallography and microhardness of both selected field failures and exemplar fittings.

6. Microfocus x-rays of exemplar fittings.

7. Depositions of: William Marshall, July 8, 2008
William Marshall, July 9, 2008
Jugal Malani, July 9, 2008

8. Uponor – Summary of Abbreviated Investigation, July 13, 2006, RMA: 717447

9. Uponor – Summary of Investigation – Unique Brass Fittings
- Undated Bates Numbers UI08452 to 08472

10. NSF/ANSI Standard 14 – Bates UI08070 to 08079

11. Uponor Notice of Revision – UI02098 to UI02102

12. Emails:
a) from Mark Dubanoski to Anders Tollsten
January 11, 2007
b) from Loc Hoang to John Liebelt, 12/01/2006

13. Documents:
UI08062 to UI08069
UI08434 to UI08451
UI08474 to UI08495
UI00689 to 00693
UI00944
UI00714
UI00899-00900
UI01261 to 01263
Deposition Exhibits 45 – 51
Deposition Exhibits 30 – 36
UI01016 to 01018

14. Documents: Unique/Uponor 000095 to 000168

Based upon this investigation, I have made the following observations and I have formed the following opinions based upon a reasonable degree of engineering certainty.

1. Each of the field failures fractured due to stress corrosion cracking. These cracks were initiated by cracks on the inside wall of the fittings. This inside wall is a machined (drilled) surface; however, the machined surfaces of both fractured and new exemplar fittings showed severe smearing and surface cracking. Such smearing and surface cracking can be produced by a number of factors, including *inter alia* dull tools, excessive tool feeds and speeds, and improper alloy composition or microstructure.

2. The fittings made from wrought material were specified as C36000 brass alloy. The forged fittings (elbows, tees and the like) were specified as C37700 alloy. The chemical analyses (performed by Inductively Coupled Plasma Spectrocopy except for the oxygen content) show that the lead analysis of the C37700 alloy was consistently outside the ASTM B283 specification range. Some of the iron analyses were above the B283 maximum value. Some of the C36000 alloy samples also failed to meet the chemical requirements for iron content.

3. The bend tests showed significantly different behavior between the C36000 couplings and the C37700 forgings. The couplings, which were presumably machined from bar stock could sustain a 2T bend of 180°. The C37700 forgings fractured with low ductility at a considerably smaller angle and a larger bend radius. Observation of the fracture surface of the C36000 alloy in the Scanning Electron Microscope, revealed ductile dimples. The C37700 fractures exhibited little evidence of ductile dimpling.

4. Microhardness tests across the thickness of an exemplar sample LL-1 indicated a Vicker's hardness on both machined surfaces of 145 to 152 with a core hardness of 115. This higher surface hardness is consistent with the smearing and cracking observed on the machined surfaces. Such smearing and higher hardness will create surface residual stresses on the fitting.

5. Observation of the lead particle size distribution using both the microfocus x-ray and metallography, showed a 20 to 100 micron lead particle size in the C36000 alloy as expected for free machining brasses. The C37700 forgings had no larger lead particles; the entire lead distribution was a fine dispersion of 1 to 3 micron particles. Such a fine dispersion of second phase particles results in a substantial loss of ductility [see W.A. Backofen, *Deformation Processing*, Addison Wesley, 1972, p.247].

6. The fine dispersion of lead particles can be explained by reference to the copper-zinc-lead ternary phase diagram [see, Handbook of Ternary Alloy Phase Diagrams, Volume 8, ASM International, 1995, p.9937]. As these brasses are heated to temperatures above 700°C, the lead will dissolve in the brass. If the alloy cools too quickly, the lead will re-precipitate as a fine dispersion.

7. Mr. Marshall indicated that the brass fittings would fail the dimensional checks 1 to 2 percent of the time [Marshall deposition, 8 July 2008, p.44]. Uponor's internal testing also reflected failure of dimensional checks [see the email referred to in 12(b) above). These dimensional discrepancies, plus the failure to meet the chemical specifications (see paragraph 2 above as well as testing performed by Stork Labs) indicates that a substantial number of these fittings did not meet the ASTM F1807 specifications.

8. Mr. Malani indicated that the Korean manufacturer used a lead leaching process to remove lead from the surface [Mulani deposition, p.22]. Such leaching of the lead would produce notches in the surface. These notches, combined with the surface residual stresses, will contribute significantly to the formation of stress corrosion cracking both prior to service and during service of these fittings.

9. Although Dr. Hays' report indicates that the failures occurred due to fatigue, I see no evidence of fatigue failure on the fracture surface of the brass fittings. In addition, estimation of the cyclic stresses due to "the pulsating flow of the water throughput," indicates levels of less than 100 psi. These cyclic stresses are too low to cause fatigue in brass alloys such as these fittings. Thus, failure due to fatigue is highly improbable.

10. Dr. Hays' report indicates that the neutral axis of the fitting is the mid-thickness of the tube wall. This is incorrect. For a tube, the neutral axis is at the axial center of the tube. Use of the neutral axis as selected by Dr. Hays will result in huge errors in the calculated bending stresses.

11. The failures of these fittings are related to manufacturing deficiencies (rough machining, compositional variations, dimensional deviations, aggressive leaching) and are not due to deficiencies in design of the fittings. Detection of such manufacturing defects is the responsibility of both the manufacturer and the distributor (Unique). The manufacturer is responsible for quality control continuously throughout the manufacturing process. The distributor or reseller (Unique) is responsible for quality assurance. Such quality assurance requires periodic quality audits of the manufacturing facility as well as random testing of samples of the received products to ensure that the specifications are being met. Unique acknowledges that such quality assurance procedures were not in place and incoming material was merely trans-shipped to Uponor.

> The distinction between design and manufacturing applies to the approval of NSF as well. NSF approves designs and materials, but NSF does not certify or audit the manufacturing process to ensure that a consistent product quality is being produced. Stated simply, NSF approval certifies the design but does not provide manufacturing quality control or even quality assurance. NSF approval indicates that the design meets a particular specification.

Based upon the foregoing, I have concluded to a reasonable degree of engineering certainty that these failures occurred due to stress corrosion cracking (SCC). The cause of the SCC was multi-dimensional including the high surface residual stresses and pre-cracking. These high residual stresses and pre-cracks were due to improper machining and lead leaching of the fittings. Many of the fittings did not conform to ASTM F1807, as required. The failure of the fittings to comply with F1807 also played a role in the process leading to SCC. Thus, these failures result from manufacturing defects in the fittings.

Based upon this investigation, it is my opinion that it was appropriate for Uponor to reject fittings which did not conform to the ASTM F1807 specification in terms of chemical composition and dimensions. Any seller of fittings represented to conform to the ASTM specification, which seller knew that the fittings did not conform, would be making a serious misrepresentation of the product. In addition, the smeared metal due to improper machining meant that these fittings were not of the standard of quality expected of parts manufactured from free cutting brass. Free cutting brass should produce one of the cleanest and smoothest and least deformed machined surfaces.

Sincerely yours,

Thomas W. Eagar

Thomas W. Eagar

jh

# APPENDIX A

1. New fittings rejected by Uponor for non-conforming chemistry (52 fittings total):

| | | |
|---|---|---|
| a. | P4516375-P119 | (2 fittings) |
| b. | P4515050-T1 | (2 fittings) |
| c. | P4845050-T1 | (2 fittings) |
| d. | P4175050-T1 | (2 nuts) |
| e. | P4525050-T1 | (2 fittings) |
| f. | P4376375-P119 | (2 fittings) |
| g. | P4503850-P119 | (2 fittings) |
| h. | P4175050-P119 | (2 fittings) |
| i. | P4705050-P119 | (2 fittings) |
| j. | P4506375-T3 | (2 fittings) |
| k. | P4703838-T3 | (2 fittings) |
| l. | P4545050-P119 | (2 fittings) |
| m. | AA-1-Loose/P4707555 | (2 fittings) |
| n. | CC-1-Loose/P4710500 | (2 fittings) |
| o. | EE-Loose/P4710500 | (5 fittings) |
| p. | EE-1-P4710500 | (5 fittings) |
| q. | JJ-1/P4705050 | (5 fittings) |
| r. | KK-4/P4705050 | (5 fittings) |
| s. | MM-1/P4705050 | (1 fitting) |
| t. | NN-3-Loose/P4707555 | (3 fittings) |

2. Field-returned fitting that Uponor destructively evaluated:

   a. MA00507

3. Field-returned fractured fittings in the as-received condition:

   a. MA00492
   b. MA00523
   c. MA00539

4. New fittings (never installed) returned from distributors who have had fittings crack in the field:

   a. LL-Loose (5 fittings)
   b. LL-1 (5 fittings)
   c. JJ-1 (5 fittings)

5. Field-returned fittings received March 16:

   a. MA00506
   b. MA00493

6. 25 – P4710500 elbows from Ryan Homes

7. Received March 22:

   a. LL-1 (5 fittings)

# APPENDIX B

FEB-28-2007 12:03 MMR 508 835 9025 P.01

MMR
A Subsidiary of THE MMR GROUP, INC.
**Massachusetts Materials Research, Inc.**
P.O. BOX 810 • 1500 CENTURY DRIVE • WEST BOYLSTON, MA 01583 • TEL. 508-835-6262 • FAX 508-835-9025

## ANALYTICAL REPORT

Harold R. Larson, ScD
Massachusetts Institute of Technology
77 Mass Ave., Room 4-049
Cambridge, MA 02139

**DATE:** February 28, 2007

**P.O. NO.:**

**MMR NO.:** 61061

**MMR ID#:** 1

**PAGE #:** 1 of 1

**ATTENTION:** Harold Larson

**SAMPLE IDENTIFICATION** Brass Sample, JJ-1

CHEMISTRY

| Element | Composition (%) |
|---|---|
| Copper | 57.1 |
| Zinc | 40.9 |
| Lead | 1.39 |
| Aluminum | <.01 |
| Sulfur | <.001 |
| Iron | .24 |
| Tin | .19 |
| Antimony | .01 |
| Arsenic | .02 |
| Silicon | .01 |
| Oxygen | 14 PPM |

MASSACHUSETTS MATERIALS RESEARCH, INC.

Vernon K. Coutu
Chief Corporate Chemist

The recording of false, fictitious or fraudulent statements or entries on the certificate may be punishable as a felony under federal law.

Chemical analysis performed by Inductively Coupled Plasma/Optical Emission Spectrometer. Carbon, sulfur, nitrogen, hydrogen and oxygen performed by Leco Combustion. Mechanical and metallurgical testing performed per MMR Procedures.

The results reported above apply only to the test sample(s) provided.
In no event shall Massachusetts Materials Research, Inc. be liable for any special, consequential or other damages.

Accredited Nadcap
Materials Testing Laboratory
ISO/IEC Guide 17025

MMR
A Subsidiary of THE MMR GROUP, INC.

# Massachusetts Materials Research, Inc.

P.O. BOX 810 • 1500 CENTURY DRIVE • WEST BOYLSTON, MA 01583 • TEL. 508-835-6262 • FAX 508-835-9025

## ANALYTICAL REPORT

Harold R. Larson, ScD
Massachusetts Institute of Technology
77 Mass Ave., Room 4-049
Cambridge, MA 02139

**ATTENTION:** Harold Larson

**DATE:** February 28, 2007

**P.O. NO.:**

**MMR NO.:** 61061

**MMR ID#:** 2

**PAGE #:** 1 of 1

**SAMPLE IDENTIFICATION** Brass Sample, P4503850-P119

CHEMISTRY

| Element | Composition (%) |
|---|---|
| Copper | 59.5 |
| Zinc | 35.8 |
| Lead | 2.87 |
| Aluminum | .12 |
| Sulfur | <.001 |
| Iron | .52 |
| Tin | .74 |
| Antimony | .04 |
| Arsenic | .02 |
| Silicon | .05 |
| Nickel | .31 |
| Oxygen | 6 PPM |

MASSACHUSETTS MATERIALS RESEARCH, INC.

Vernon K. Coutu
Chief Corporate Chemist

The recording of false, fictitious or fraudulent statements or entries on the certificate may be punishable as a felony under federal law.

Accredited Nadcap Materials Testing Laboratory ISO/IEC Guide 17025

Chemical analysis performed by Inductively Coupled Plasma/Optical Emission Spectrometer. Carbon, sulfur, nitrogen, hydrogen and oxygen performed by Leco Combustion. Mechanical and metallurgical testing performed per MMR Procedures.

The results reported above apply only to the test sample(s) provided.
In no event shall Massachusetts Materials Research, Inc. be liable for any special, consequential or other damages.
This report shall not be reproduced, except in full, without written approval of MMR.

FEB-28-2007 12:03 MMR 508 835 9025 P.03

MMR

A Subsidiary of THE MMR GROUP, INC.

# Massachusetts Materials Research, Inc.

P.O. BOX 810 • 1500 CENTURY DRIVE • WEST BOYLSTON, MA 01583 • TEL. 508-835-6262 • FAX 508-835-9025

## ANALYTICAL REPORT

Harold R. Larson, ScD
Massachusetts Institute of Technology
77 Mass Ave., Room 4-049
Cambridge, MA 02139

**DATE:** February 28, 2007

**P.O. NO.:**

**MMR NO.:** 61061

**MMR ID#:** 3

**PAGE #:** 1 of 1

**ATTENTION:** Harold Larson

**SAMPLE IDENTIFICATION** Brass Sample, JJ-1

CHEMISTRY

| Element | Composition (%) |
|---|---|
| Copper | 56.3 |
| Zinc | 41.8 |
| Lead | 1.34 |
| Aluminum | <.01 |
| Sulfur | <.001 |
| Iron | .25 |
| Tin | .19 |
| Antimony | .02 |
| Arsenic | .02 |
| Silicon | .01 |
| Nickel | .05 |
| Oxygen | 7 PPM |

MASSACHUSETTS MATERIALS RESEARCH, INC.

Vernon K. Coutu
Chief Corporate Chemist

The recording of false, fictitious or fraudulent statements or entries on the certificate may be punishable as a felony under federal law.

Chemical analysis performed by Inductively Coupled Plasma/Optical Emission Spectrometer. Carbon, sulfur, nitrogen, hydrogen and oxygen performed by Leco Combustion. Mechanical and metallurgical testing performed per MMR Procedures.

The results reported above apply only to the test sample(s) provided.
In no event shall Massachusetts Materials Research, Inc. be liable for any special, consequential or other damages.

Accredited Nadcap Materials Testing Laboratory ISO/IEC Guide 17025

MMR
A Subsidiary of THE MMR GROUP, INC.

# Massachusetts Materials Research, Inc.

P.O. BOX 810 • 1500 CENTURY DRIVE • WEST BOYLSTON, MA 01583 • TEL. 508-835-6262 • FAX 508-835-9025

## ANALYTICAL REPORT

Harold R. Larson, ScD
Massachusetts Institute of Technology
77 Mass Ave., Room 4-049
Cambridge, MA 02139

**ATTENTION:** Harold Larson

**DATE:** February 28, 2007

**P.O. NO.:**

**MMR NO.:** 61061

**MMR ID#:** 4

**PAGE #:** 1 of 1

**SAMPLE IDENTIFICATION** Brass Sample, EE-1

CHEMISTRY

| Element | Composition (%) |
|---|---|
| Copper | 57.1 |
| Zinc | 41.0 |
| Lead | 1.15 |
| Aluminum | .02 |
| Sulfur | <.001 |
| Iron | .23 |
| Tin | .32 |
| Arsenic | .02 |
| Silicon | .04 |
| Nickel | .11 |
| Oxygen | 20 PPM |

MASSACHUSETTS MATERIALS RESEARCH, INC.

Vernon K. Coutu
Chief Corporate Chemist

The recording of false, fictitious or fraudulent statements or entries on the certificate may be punishable as a felony under federal law.

Chemical analysis performed by Inductively Coupled Plasma/Optical Emission Spectrometer. Carbon, sulfur, nitrogen, hydrogen and oxygen performed by Leco Combustion. Mechanical and metallurgical testing performed per MMR Procedures.

The results reported above apply only to the test sample(s) provided.
In no event shall Massachusetts Materials Research, Inc. be liable for any special, consequential or other damages.
This report shall not be reproduced, except in full, without written approval of MMR.

Accredited Nadcap
Materials Testing Laboratory
ISO/IEC Guide 17025

FEB-28-2007 12:03 MMR 508 835 9025 P.05

MMR

A Subsidiary of THE MMR GROUP, INC.

# Massachusetts Materials Research, Inc.

P.O. BOX 810 • 1500 CENTURY DRIVE • WEST BOYLSTON, MA 01583 • TEL. 508-835-6262 • FAX 508-835-9025

ANALYTICAL REPORT

Harold R. Larson, ScD
Massachusetts Institute of Technology
77 Mass Ave., Room 4-049
Cambridge, MA 02139

**DATE:** February 28, 2007

**P.O. NO.:**

**MMR NO.:** 61061

**MMR ID#:** 5

**PAGE #:** 1 of 1

**ATTENTION:** Harold Larson

**SAMPLE IDENTIFICATION** Brass Sample, EE-Loose

CHEMISTRY

| Element | Composition (%) |
|---|---|
| Copper | 57.2 |
| Zinc | 41.0 |
| Lead | 1.27 |
| Aluminum | <.01 |
| Sulfur | <.001 |
| Iron | .27 |
| Tin | .21 |
| Antimony | .01 |
| Arsenic | .03 |
| Silicon | .03 |
| Nickel | .06 |
| Oxygen | 4 PPM |

MASSACHUSETTS MATERIALS RESEARCH, INC.

Vernon K. Coutu
Chief Corporate Chemist

The recording of false, fictitious or fraudulent statements or entries on the certificate may be punishable as a felony under federal law.

Chemical analysis performed by Inductively Coupled Plasma/Optical Emission Spectrometer. Carbon, sulfur, nitrogen, hydrogen and oxygen performed by Leco Combustion. Mechanical and metallurgical testing performed per MMR Procedures.

The results reported above apply only to the test sample(s) provided.
In no event shall Massachusetts Materials Research, Inc. be liable for any special, consequential or other damages.
[illegible] without written approval of MMR

Accredited Nadcap Materials Testing Laboratory ISO/IEC Guide 17025

MMR

A Subsidiary of THE MMR GROUP, INC.

# Massachusetts Materials Research, Inc.

P.O. BOX 810 • 1500 CENTURY DRIVE • WEST BOYLSTON, MA 01583 • TEL. 508-835-6262 • FAX 508-835-9025

## ANALYTICAL REPORT

Harold R. Larson, ScD
Massachusetts Institute of Technology
77 Mass Ave., Room 4-049
Cambridge, MA 02139

**DATE:** February 28, 2007

**P.O. NO.:**

**MMR NO.:** 61061

**MMR ID#:** 6

**PAGE #:** 1 of 1

**ATTENTION:** Harold Larson

**SAMPLE IDENTIFICATION** Brass Sample, AA-1

CHEMISTRY

| Element | Composition (%) |
|---|---|
| Copper | 55.4 |
| Zinc | 12.5 |
| Lead | 1.43 |
| Aluminum | <.01 |
| Sulfur | <.001 |
| Iron | .35 |
| Tin | .19 |
| Arsenic | .02 |
| Silicon | .03 |
| Nickel | .05 |
| Oxygen | 7 PPM |

X

MASSACHUSETTS MATERIALS RESEARCH, INC.

Vernon K. Coutu
Chief Corporate Chemist

The recording of false, fictitious or fraudulent statements or entries on the certificate may be punishable as a felony under federal law

Chemical analysis performed by Inductively Coupled Plasma/Optical Emission Spectrometer. Carbon, sulfur, nitrogen, hydrogen and oxygen performed by Leco Combustion. Mechanical and metallurgical testing performed per MMR Procedures.

The results reported above apply only to the test sample(s) provided.
In no event shall Massachusetts Materials Research, Inc. be liable for any special, consequential or other damages.

Accredited Nadcap Materials Testing Laboratory ISO/IEC Guide 17025

MMR

A Subsidiary of THE MMR GROUP, INC.

# Massachusetts Materials Research, Inc.

P.O. BOX 810 • 1500 CENTURY DRIVE • WEST BOYLSTON, MA 01583 • TEL. 508-835-6262 • FAX 508-835-9025

## ANALYTICAL REPORT

Harold R. Larson, ScD
Massachusetts Institute of Technology
77 Mass Ave., Room 4-049
Cambridge, MA 02139

**ATTENTION:** Harold Larson

**DATE:** February 28, 2007

**P.O. NO.:**

**MMR NO.:** 61061

**MMR ID#:** 7

**PAGE #:** 1 of 1

**SAMPLE IDENTIFICATION** Brass Sample, P4545050-P119

CHEMISTRY

| Element | Composition (%) |
|---|---|
| Copper | 58.5 |
| Zinc | 36.5 |
| Lead | 2.71 |
| Aluminum | .18 |
| Sulfur | <.001 |
| Iron | .68 |
| Tin | .88 |
| Antimony | .04 |
| Arsenic | .01 |
| Manganese | .02 |
| Silicon | .06 |
| Nickel | .39 |
| Oxygen | 9 PPM |

MASSACHUSETTS MATERIALS RESEARCH, INC.

[signature]
Vernon K. Coutu
Chief Corporate Chemist

The recording of false, fictitious or fraudulent statements or entries on the certificate may be punishable as a felony under federal law.

Chemical analysis performed by Inductively Coupled Plasma/Optical Emission Spectrometer. Carbon, sulfur, nitrogen, hydrogen and oxygen performed by Leco Combustion. Mechanical and metallurgical testing performed per MMR Procedures.

The results reported above apply only to the test sample(s) provided.
In no event shall Massachusetts Materials Research, Inc. be liable for any special, consequential or other damages.

Accredited Nadcap Materials Testing Laboratory ISO/IEC Guide 17025

FEB-28-2007 12:03 MMR 508 835 9025 P.08

MMR

A Subsidiary of THE MMR GROUP, INC.

# Massachusetts Materials Research, Inc.

P.O. BOX 810 • 1500 CENTURY DRIVE • WEST BOYLSTON, MA 01583 • TEL. 508-835-6262 • FAX 508-835-9025

## ANALYTICAL REPORT

Harold R. Larson, ScD
Massachusetts Institute of Technology
77 Mass Ave., Room 4-049
Cambridge, MA 02139

**ATTENTION:** Harold Larson

**DATE:** February 28, 2007

**P.O. NO.:**

**MMR NO.:** 61061

**MMR ID#:** 8

**PAGE #:** 1 of 1

**SAMPLE IDENTIFICATION** Brass Sample, LL-1

CHEMISTRY

| Element | Composition (%) |
|---|---|
| Copper | 57.2 |
| Zinc | 40.9 |
| Lead | 1.31 |
| Aluminum | <.01 |
| Sulfur | <.001 |
| Iron | .24 |
| Tin | .18 |
| Antimony | .01 |
| Arsenic | .02 |
| Silicon | .02 |
| Nickel | .06 |
| Oxygen | 9 PPM |

**MASSACHUSETTS MATERIALS RESEARCH, INC.**

Vernon K. Coutu
Chief Corporate Chemist

The recording of false, fictitious or fraudulent statements or entries on the certificate may be punishable as a felony under federal law.

Chemical analysis performed by Inductively Coupled Plasma/Optical Emission Spectrometer. Carbon, sulfur, nitrogen, hydrogen and oxygen performed by Leco Combustion. Mechanical and metallurgical testing performed per MMR Procedures.

The results reported above apply only to the test sample(s) provided.
In no event shall Massachusetts Materials Research, Inc. be liable for any special, consequential or other damages.

Accredited Nadcap Materials Testing Laboratory ISO/IEC Guide 17025

MMR
A Subsidiary of THE MMR GROUP, INC.

# Massachusetts Materials Research, Inc.

P.O. BOX 810 • 1500 CENTURY DRIVE • WEST BOYLSTON, MA 01583 • TEL. 508-835-6262 • FAX 508-835-9025

## ANALYTICAL REPORT

Harold R. Larson, ScD
Massachusetts Institute of Technology
77 Mass Ave., Room 4-049
Cambridge, MA 02139

**DATE:** February 28, 2007

**P.O. NO.:**

**MMR NO.:** 61061

**ATTENTION:** Harold Larson

**MMR ID#:** 9

**PAGE #:** 1 of 1

**SAMPLE IDENTIFICATION** Brass Sample, LL-Loose

CHEMISTRY

| Element | Composition (%) |
|---|---|
| Copper | 56.1 |
| Zinc | 40.2 |
| Lead | 2.78 |
| Aluminum | .04 |
| Sulfur | <.001 |
| Iron | .39 |
| Tin | .31 |
| Antimony | .03 |
| Arsenic | .04 |
| Silicon | .02 |
| Nickel | .11 |
| Oxygen | 6 PPM |

MASSACHUSETTS MATERIALS RESEARCH, INC.

Vernon K. Coutu
Chief Corporate Chemist

The recording of false, fictitious or fraudulent statements or entries on the certificate may be punishable as a felony under federal law.

Chemical analysis performed by Inductively Coupled Plasma/Optical Emission Spectrometer. Carbon, sulfur, nitrogen, hydrogen and oxygen performed by Leco Combustion. Mechanical and metallurgical testing performed per MMR Procedures.

The results reported above apply only to the test sample(s) provided.
In no event shall Massachusetts Materials Research, Inc. be liable for any special, consequential or other damages.
This report shall not be reproduced except in full without written approval of MMR.

Accredited Nadcap
Materials Testing Laboratory
ISO/IEC Guide 17025

MMR

A Subsidiary of THE MMR GROUP, INC.

# Massachusetts Materials Research, Inc.

P.O. BOX 810 • 1500 CENTURY DRIVE • WEST BOYLSTON, MA 01583 • TEL. 508-835-6262 • FAX 508-835-9025

## ANALYTICAL REPORT

Harold R. Larson, ScD
Massachusetts Institute of Technology
77 Mass Ave., Room 4-049
Cambridge, MA 02139

**ATTENTION:** Harold Larson

**DATE:** February 28, 2007

**P.O. NO.:**

**MMR NO.:** 61061

**MMR ID#:** 10

**PAGE #:** 1 of 1

**SAMPLE IDENTIFICATION** Brass Sample, P4525050-T1

CHEMISTRY

| Element | Composition (%) |
|---|---|
| Copper | 59.0 |
| Zinc | 34.7 |
| Lead | 2.99 |
| Aluminum | .61 |
| Sulfur | <.001 |
| Iron | 1.10 |
| Tin | .87 |
| Antimony | .04 |
| Arsenic | .02 |
| Manganese | .06 |
| Silicon | .08 |
| Nickel | .52 |
| Phosphorus | .01 |
| Oxygen | 7 PPM |

MASSACHUSETTS MATERIALS RESEARCH, INC.

Vernon K. Coutu
Chief Corporate Chemist

The recording of false, fictitious or fraudulent statements or entries on the certificate may be punishable as a felony under federal law.

Chemical analysis performed by Inductively Coupled Plasma/Optical Emission Spectrometer. Carbon, sulfur, nitrogen, hydrogen and oxygen performed by Leco Combustion. Mechanical and metallurgical testing performed per MMR Procedures.

The results reported above apply only to the test sample(s) provided.
In no event shall Massachusetts Materials Research, Inc. be liable for any special, consequential or other damages.
[illegible] full without the written approval of MMR

Accredited Nadcap
Materials Testing Laboratory
ISO/IEC Guide 17025

MMR
A Subsidiary of THE MMR GROUP, INC.

# Massachusetts Materials Research, Inc.

P.O. BOX 810 • 1500 CENTURY DRIVE • WEST BOYLSTON, MA 01583 • TEL. 508-835-6262 • FAX 508-835-9025

## ANALYTICAL REPORT

Harold R. Larson, ScD
Massachusetts Institute of Technology
77 Mass Ave., Room 4-049
Cambridge, MA 02139

**ATTENTION:** Harold Larson

**DATE:** February 28, 2007

**P.O. NO.:**

**MMR NO.:** 61061

**MMR ID#:** 11

**PAGE #:** 1 of 1

**SAMPLE IDENTIFICATION** Brass Sample, P4175050-P119 Nut

CHEMISTRY

| Element | Composition (%) |
|---|---|
| Copper | 56.6 |
| Zinc | 39.0 |
| Lead | 3.65 |
| Aluminum | <.01 |
| Sulfur | <.001 |
| Iron | .29 |
| Tin | .34 |
| Antimony | .01 |
| Silicon | .02 |
| Nickel | .10 |
| Oxygen | 12 PPM |

MASSACHUSETTS MATERIALS RESEARCH, INC.

Vernon K. Coutu
Chief Corporate Chemist

The recording ... false, fictitious or fraudulent statements ... ies on the certificate may be punishable a... felony under federal law.

Chemical an...s performed by Inductively Coupled Plasma/Optical Emission Spectrometer. Carbon, sulfur, nitrogen, hydrogen and oxygen ...rmed by Leco Combustion. Mechanical and metallurgical testing performed per MMR Procedures.

The results r...ed above apply only to the test sample(s) provided.
In no event s... Massachusetts Materials Research, Inc be liable for any special, consequential or other damages.

Accredited Nadcap
Materials Testing Laboratory
ISO/IEC Guide 17025

FEB-28-2( 12:04 MMR 508 835 9025 P.12

MMR
A Subsidiary of THE MMR GROUP, INC.

# M ssachusetts Materials Research, Inc.

P. .OX 810 • 1500 CENTURY DRIVE • WEST BOYLSTON, MA 01583 • TEL. 508-835-6262 • FAX 508-835-9025

## ANALYTICAL REPORT

Har d R. Larson, ScD
Mas chusetts Institute of Technology
77 ss Ave., Room 4-049
Ca dge, MA 02139

DATE: February 28, 2007

P.O. NO.:

MMR NO.: 61061

MMR ID#: 12

PAGE #: 1 of 1

ATTENTIO Harold Larson

SAMPLE ID ICATION Brass Sample, P4515050-T1

| CH TRY<br>El nt | Composition (%) |
|---|---|
| Co r | 59.6 |
| Zi | 35.3 |
| Le | 2.90 |
| Al num | .26 |
| S r | <.001 |
| I | .66 |
| T | .89 |
| A ny | .04 |
| M nese | .03 |
| S on | .07 |
| N l | .34 |
| C n | 9 PPM |

MASSACHUSETTS MATERIALS RESEARCH, INC.

Vernon K. Coutu
Chief Corporate Chemist

The record alse, fictitious or fraudulent statement s on the certificate may be punishable ny under federal law.

Chemical a performed by Inductively Coupled Plasma/Optical Emission Spectrometer. Carbon, sulfur, nitrogen, hydrogen and oxyge ned by Leco Combustion. Mechanical and metallurgical testing performed per MMR Procedures.

The result d above apply only to the test sample(s) provided.
In no event assachusetts Materials Research, Inc. be liable for any special, consequential or other damages.

Accredited Nadcap
Materials Testing Laboratory ISO/IEC Guide 17025

FEB-28-2 12:04 MMR 508 835 9025 P.13

MMR

A Subsidiary of THE MMR GROUP, INC.

# M ssachusetts Materials Research, Inc.

810 • 1500 CENTURY DRIVE • WEST BOYLSTON, MA 01583 • TEL. 508-835-6262 • FAX 508-835-9025

## ANALYTICAL REPORT

Ha: R. Larson, ScD
Ma: husetts Institute of Technology
77 s Ave., Room 4-049
C: dge, MA 02139

DATE: February 28, 2007

P.O. NO.:

MMR NO.: 61061

MMR ID#: 13

PAGE #: 1 of 1

ATTENTIO: rold Larson

SAMPLE I: CATION Brass Sample, NN-3-Loose

C: TRY

| El: t | Composition (%) |
|---|---|
| Co: | 57.0 |
| Zi: | 39.4 |
| L: | 2.76 |
| A: um | <.01 |
| S: | <.001 |
| I: | .35 |
| T: | .29 |
| S: n | .02 |
| N: | .08 |
| O: n | 10 PPM |

MASSACHUSETTS MATERIALS RESEARCH, INC.

Vernon K. Coutu
Chief Corporate Chemist

The record: e, fictitious or fraudulent statements : on the certificate may be punishable y under federal law.

Chemical a rformed by Inductively Coupled Plasma/Optical Emission Spectrometer. Carbon, sulfur, nitrogen, hydrogen and oxygen ed by Leco Combustion. Mechanical and metallurgical testing performed per MMR Procedures.

The results above apply only to the test sample(s) provided.
In no event ssachusetts Materials Research, Inc. be liable for any special, consequential or other damages.
This report be reproduced, except in full, without written approval of MMR.

Accredited Nadcap
Materials Testing Laboratory ISO/IEC Guide 17025

TOTAL P.13

# EXHIBIT D

uponor

PLUMBING SYSTEMS

FITTING SYSTEMS

FACT SHEET

# How does the Brass ASTM F1960 Standard Uponor ProPEX® Fitting System compare with ASTM F1807 Standard Insert Fittings?

ASTM F1807 Standard Insert Fitting

ASTM F1960 Standard ProPEX Fitting






ASTM F1960 Standard Fitting

ASTM F1807 Standard Fitting

| | ASTM F1960 Standard Uponor ProPEX® Fitting System | | ASTM F1807 Standard Insert Fittings | | Uponor ProPEX Advantages |
|---|---|---|---|---|---|
| A | Thicker wall results in lower overall stress for superior performance in all water environments | ½" fitting = 0.057" wall thickness<br>1" fitting = 0.072" wall thickness | Thinner wall offers less resistance to stress and corrosion | ½" fitting = 0.028" wall thickness<br>1" fitting = 0.041" wall thickness | ½" fitting features 103% greater wall thickness<br>1" fitting features 75% greater wall thickness |
| B | Larger cross-sectional area provides better flow | ½" fitting = 0.112 sq. inches 2.9 gpm at 8 ft./sec.<br>1" fitting = 0.496 sq. inches 12.4 gpm at 8 ft./sec. | Smaller cross-sectional area restricts flow | ½" fitting = 0.096 sq. inches 2.4 gpm at 8 ft./sec.<br>1" fitting = 0.396 sq. inches 9.9 gpm at 8 ft./sec. | ½" fitting offers 20% higher gpm<br>1" fitting offers 25% higher gpm |
| C | Greater minimum internal diameter (i.d.) | ½" fitting = 0.378"<br>1" fitting = 0.795" | Smaller minimum i.d. | ½" fitting = 0.350"<br>1" fitting = 0.710" | ½" fitting has 8% larger minimum i.d.<br>1" fitting has 12% larger minimum i.d. |
| | Large offering of engineered plastic (EP) fittings available | | Limited offering of plastic fittings available | | Plastic fittings more resistant to aggressive water environments compared with metal fittings |
| | Works with the shape-memory properties of Uponor PEX-a tubing | | Does not take advantage of the properties of PEX-a tubing | | Provides a stronger, more reliable connection |
| | Go/no-go gauges are never required | | Requires testing every copper crimp fitting connection with a go/no-go gauge | | Saves valuable installation time |
| | Cannot be dry fit — never a question if the connection is made | | Can be dry fit — could result in uncrimped connections | | Never have to second-guess whether a connection is complete |

**Uponor, Inc.**
5925 148th Street West
Apple Valley, MN 55124 USA

Tel: (800) 321-4739
Fax: (952) 891-1409
**Web: www.uponor-usa.com**

Brass_F1960vsF1807_FS_P031_11-07, Copyright © 2007 Uponor, Inc. Printed in the United States

# EXHIBIT E

BIRKA-WHITE LAW OFFICES
The Danville Hotel
411 Hartz Avenue, Suite 200
Danville, California 94526
Telephone: (925) 362-9999
Facsimile: (925) 362-9970

DAVID M. BIRKA-WHITE dbw@birka-white.com

December 15, 2010

**NOTICE OF VIOLATION OF**
**CONSUMER LEGAL REMEDIES ACT ("CLRA")**

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Uponor, Inc.
5925 148th Street, West
Apple Valley, MN 55124
Attn: Anders Tollsten

Uponor, Inc.
c/o National Registered Agents, Inc.
200 West Adams Street
Chicago, IL 60606

Radiant Technology, Inc.
5925 148th Street, West
Apple Valley, MN 55124
Attn: Anders Tollsten

Radiant Technology, Inc.
c/o National Registered Agents, Inc.
160 Greentree Drive, Suite 101
Dover, DE 19904

**Re: PEX Pluming System and ASTM F1807 Brass Insert Fittings**

Dear Mr. Tollsten:

Pursuant to the California Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et. seq*., and specifically § 1782(a)(1)(2), Plaintiffs, Paul and Lynn Roth, on behalf of themselves and all others similarly situated in the State of California hereby notifies you that Uponor, Inc. (formerly Wirsbo) ("Uponor") and its wholly owned subsidiary, Radiant Technologies, Inc. ("RTI") have violated California Civil Code § 1770 by advertising and selling PEX plumbing systems and ASTM F1807 brass insert fittings ("Fittings") which they knew to be defective and not in conformance with their representations to Plaintiffs and thousands of California consumers. This conduct constitutes the following violations of § 1770:

1. Uponor and RTI represented that their PEX plumbing system with Fittings had benefits or characteristics that they did not actually have. Civ. Code § 1770(a)(5).

2. Uponor and RTI represented, that their PEX plumbing system with Fittings was of a particular standard or quality when they were of another. Civ. Code § 1770(a)(7).

Specifically, Uponor and RTI represented in marketing materials that their PEX plumbing systems were durable, would resist scaling and mineral buildup, would not rust or corrode and keep flow constant year after year, were resistant to aggressive water and soils, and will last for the warranted period or useful life of the system.

These representations and warranties are not true. Uponor and RTI knew and had known for many years that their PEX plumbing systems and Fittings did not conform to these representations. In fact, the composition of the Fittings virtually guarantees the PEX plumbing system will deteriorate well in advance of the warranted useful life.

We believe the evidence supports the proposition that the proportions, quality of the metallic compounds in the Fittings, the manufacturing process of the Fittings, and the crimp and clamp system utilized as part of your PEX system, causes degradation stress corrosion cracking and dezincification in the Fittings when used as intended in potable water systems ultimately leading to corrosion of the Fittings and leakage.

The Roths recently became aware that the Fittings installed in their property located at 1610 E. Ave J2, Lancaster, California, were defective when their PEX plumbing system failed at one of the Fittings and began to leak, causing damage to their property. It was recommended that Plaintiffs replace all RTI Fittings and completely re-pipe their PEX plumbing system.

Plaintiffs, on behalf of themselves and all others similarly situated in the State of California, hereby demand that Uponor and RTI: (1) pay all costs required to investigate, repair, and replace all PEX plumbing systems with defective Uponor or RTI Fittings installed since January 1, 2002 on the properties of California residents; and (2) provide notice to California consumers of the product performance issues in this letter and of their right to present a claim. We demand Uponor and RTI remedy these defects within thirty (30) days of receipt of this letter.

If you have any questions regarding this notice and demand, please contact the undersigned counsel at 925-362-9999.

Sincerely,

David M. Birka-White

cc: Michael F. Ram, Esq.
Jeffrey B. Cereghino, Esq.

# EXHIBIT F

David M. Birka-White (State Bar No. 85721)
dbw@birka-white.com
Stephen Oroza (State Bar No. 84681)
soroza@birka-white.com
Mindy M. Wong (State Bar No. 267820)
mwong@birka-white.com
BIRKA-WHITE LAW OFFICES
411 Hartz Avenue, Suite 200
Danville, CA 94526
Telephone: (925) 362-9999
Facsimile: (925) 362-9970

Michael F. Ram (State Bar No. 104805)
mram@ramolson.com
RAM & OLSON
555 Montgomery Street, Suite 820
San Francisco, CA 94104
Telephone: (415) 433-4949
Facsimile: (415) 433-7311

Attorneys for Individual and Representative
Plaintiffs PAUL ROTH and LYNN ROTH

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

PAUL ROTH and LYNN ROTH, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

UPONOR, INC., an Illinois corporation, RADIANT TECHNOLOGY, INC., a Delaware corporation, and DOES 1-10, inclusive,

Defendants.

Case No.

**DECLARATION OF PAUL ROTH**

I, PAUL ROTH, declare as follows:

1. I am the Plaintiff and proposed class representative in this case. I have personal knowledge of the matters set forth below, except as to those matters stated herein which are based on information and belief, which matters I believe to be true. If called to testify, I could and would testify competently to these matters herein included.

2. I am informed and believe that venue is proper in this court under Civil Code § 1780(c) based on the fact that, on information and belief, Defendants Uponor, Inc. and Radiant Technology, Inc. have done and are doing business in Los Angeles County.

3. Los Angeles County is also the county in which the transaction, or a substantial portion thereof, occurred.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 21 day of January, 2011, at Lancaster, California.

PAUL ROTH

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge George H. Wu and the assigned discovery Magistrate Judge is Jacqueline Chooljian.

The case number on all documents filed with the Court should read as follows:

**CV11- 705 GW (JCx)**

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

---

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
**312 N. Spring St., Rm. G-8**
**Los Angeles, CA 90012**

[ ] **Southern Division**
**411 West Fourth St., Rm. 1-053**
**Santa Ana, CA 92701-4516**

[ ] **Eastern Division**
**3470 Twelfth St., Rm. 134**
**Riverside, CA 92501**

Failure to file at the proper location will result in your documents being returned to you.

ORIGINAL

Name & Address:
David M. Birka-White (SBN 85721)
Birka-White Law Offices
411 Hartz Avenue, Suite 200
Danville, CA 94526
(925) 362-9999

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PAUL ROTH and LYNN ROTH, on behalf of themselves and all others similarly situated,<br>PLAINTIFF(S)<br>v.<br>UPONOR, INC., an Illinois corporation, and RADIANT TECHNOLOGY, INC., a Delware corporation, and Does 1-10<br>DEFENDANT(S). | CASE NUMBER<br>CV11-00705 GW(JCx)<br><br>**SUMMONS** |

TO: DEFENDANT(S): UPONOR, INC., an Illinois corporation, and RADIANT TECHNOLOGY, INC., a Delaware corporation

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ ______________ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, David M. Birka-White, whose address is 411 Hartz Avenue, Suite 200, Danville, California, 94526. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: JAN 24 2011

By: ______________________
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

COPY

Name & Address:
David M. Birka-White (SBN 85721)
Birka-White Law Offices
411 Hartz Avenue, Suite 200
Danville, CA 94526
(925) 362-9999

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PAUL ROTH and LYNN ROTH, on behalf of themselves and all others similarly situated, PLAINTIFF(S) | CASE NUMBER CV11-00705 GW(JCx) |
| v. | |
| UPONOR, INC., an Illinois corporation, and RADIANT TECHNOLOGY, INC., a Delware corporation, and Does 1-10 DEFENDANT(S). | **SUMMONS** |

TO: DEFENDANT(S): UPONOR, INC., an Illinois corporation, and RADIANT TECHNOLOGY, INC., a Delaware corporation

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ __________ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, David M. Birka-White, whose address is 411 Hartz Avenue, Suite 200, Danville, California, 94526. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: JAN 24 2011

By: JULIE PRADO
Deputy Clerk

SEAL

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

COPY

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
PAUL ROTH and LYNN ROTH, on behalf of themselves and all others similarly situated

**DEFENDANTS**
UPONOR, INC., an Illinois corporation, RADIANT TECHNOGLY, INC., a Delaware corporation, and DOES 1-10, inclusive

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Birka-White Law Offices
411 Hartz Avenue, Suite 200, Danville, CA 94526
Telephone: (925) 362-9999

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify): ☐ 6 Multi-District Litigation ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes ☐ No ☑ **MONEY DEMANDED IN COMPLAINT: $** in excess of $5,000,000.00

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
CAFA 28 U.S.C. § 1332(d)(2)(B) - Nationwide class action for unfair business practices, false advertising, unjust enrichment, fraud, and express/implied warranty.

**VII. NATURE OF SUIT** (Place an X in one box only.)

**OTHER STATUTES**
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Act
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Info. Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☑ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS — PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Fed. Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury-Med Malpractice
☐ 365 Personal Injury-Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 463 Habeas Corpus-Alien Detainee
☐ 465 Other Immigration Actions

**TORTS — PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**CIVIL RIGHTS**
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/Accommodations
☐ 444 Welfare
☐ 445 American with Disabilities - Employment
☐ 446 American with Disabilities - Other
☐ 440 Other Civil Rights

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence Habeas Corpus
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus/ Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**FORFEITURE / PENALTY**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety /Health
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS-Third Party 26 USC 7609

CV11-00705

FOR OFFICE USE ONLY: Case Number: ______________________

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

VIII(a). IDENTICAL CASES: Has this action been previously filed in this court and dismissed, remanded or closed? ☒ No ☐ Yes
If yes, list case number(s): ______

VIII(b). RELATED CASES: Have any cases been previously filed in this court that are related to the present case? ☒ No ☐ Yes
If yes, list case number(s): ______

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)
☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

IX. VENUE: (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| County of Los Angeles | Statewide (California) |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Cook County, Illinois<br>Kent County, Delaware<br>Dakota County, Minnesota |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| County of Los Angeles | |

*** Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): ______ Date January 21, 2011

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |